(No. 20743

THE PEOPLE *ex rel.* L. R. Wagner, County Collector, Appellant, *vs.* THE FREEPORT MASONIC TEMPLE, Inc., Appellee.

*Opinion filed December 17, 1931.*

Dunn and DeYoung, JJ., dissenting.

Louis F. Reinhold, State's Attorney, for appellant.

C. W. Middlekauff, for appellee.

Mr. Chief Justice Stone delivered the opinion of the court:

This is an appeal from a judgment of the county court of Stephenson county sustaining objections of appellee to the application of the county collector for judgment and order of sale for delinquent taxes for the year 1929. The objection filed by appellee is that the property is that of a beneficent and charitable organization and was actually and exclusively used for charitable or beneficent purposes and not leased or otherwise used with a view to profit and so was exempt from taxation. The amount of the tax, interest and costs for which judgment was sought was $4280.64. Appellant seeks reversal of the judgment of the county court on the ground that it was not shown that appellee owned the property, that a portion of the statute exempting property is unconstitutional, and that it was not shown that the property came within the exemption statute.

The property was assessed in the name of appellee. It is shown by the evidence to have been built by appellee, as the holder of the title thereto, for the Freeport Consistory

and used and controlled by the Consistory and the branches of the masonic order in the city of Freeport. Though the deeds were not offered in evidence, a reading of the record shows that appellee so owns the property involved. It consists of three and one-half lots in the city of Freeport, on which appellee in 1928 erected a building for use of the various branches of the masonic lodge in that city. Appellant's first point is without merit.

Appellant's second contention is, that a portion of the seventh clause of section 2 of chapter 120, relating to the revenue, in part contravenes the constitution, as enlarging the meaning of the constitutional provision concerning exemption. Section 2 relates to exemption of property from taxation. The seventh clause is as follows: "All property of institutions of public charity, all property of beneficent and charitable organizations, whether incorporated in this or in any other State of the United States and all property of old people's homes when such property is actually and exclusively used for such charitable or beneficent purposes, and not leased or otherwise used with a view to profit; and all free public libraries." The contention is that the language, "and not leased or otherwise used with a view to profit," is an attempt on the part of the legislature to enlarge the provisions of the constitution pertaining to exemptions. Section 3 of article 9 of the constitution provides: "The property of the State, county and other municipal corporations, both real and personal, and such other property as may be used exclusively for agricultural and horticultural societies, for school, religious, cemetery and charitable purposes, may be exempted from taxation; but such exemption shall be only by general law." The constitution does not exempt property from taxation but gives the power to the legislature to by general law exempt such as is within that constitutional provision. The legislature may not add to nor enlarge upon the meaning of the constitutional provision. The words "and not leased or

otherwise used with a view to profit," however, instead of enlarging the constitutional provision, as appellant argues, are entirely consistent with the provision that such property must be used exclusively for charitable purposes. They are rather a limitation on possible construction of the provisions of section 2 of the Revenue act herein quoted. Not only must the property be of the character described and actually and exclusively used for charitable purposes, but it also must not be leased or otherwise used with a view to profit. It cannot be said that such language is an attempt to enlarge upon the constitutional provisions.

The principal argument of appellant is that the property is not shown to come within the provisions of the statute. The building involved is a fraction over 108 feet in length and approximately of that width. The evidence shows that forty-four per cent of it is used for an auditorium, designed and built for the purpose of putting on the ritualistic work of Scottish Rite Masonry. It has a seating capacity of 1224 persons. The stage is 75 feet wide and 54 feet deep, with a height of 60 feet. The balance of the building consists of lodge rooms, which are rented to the Masonic Blue Lodges, the Council, the Chapter, the Eastern Star, the Capernaum Shrine, the Boy Builders, and the Consistory Auxiliary, a ladies' organization. All of these organizations are parts of the masonic order. There is also in this part of the building the office of the secretary of the appellee corporation, who is also secretary of the Consistory and has full charge of the building. There are a lounge, club room, toilets and hallways. In the basement of the building there are two dining rooms and a kitchen. The building was financed by contributions almost entirely from Masons in the territory under the jurisdiction of the Consistory, who gave their notes for varying amounts. There belong to one or more of the various organizations of the masonic order occupying the lodge rooms, 5593 persons. These have access to and rights

in the building. The cost of the building was over $400,-000. There is an indebtedness amounting to $130,000. The charter of appellee shows that the object for which it was incorporated "is to promulgate the teachings of Scottish Rite Masonry and to promote fraternity and benevolence and to purchase, lease, erect and own a masonic temple for its lodge and club rooms." The charter was originally issued in 1904 under the name, "Freeport Consistory, Sublime Princes of the Royal Secret," and in January, 1927, its name was changed to "Freeport Masonic Temple, Inc."

It is argued by appellant that appellee permitted the use of its auditorium and other rooms by organizations other than masonic and that the building was rented with a view to profit. The record shows the entire income of the building from all sources and the expense of its maintenance. For the year 1929 the cost of heating the building was $2391.65, of lighting $1994.32, water $313.81, janitor service $6039.76, supplies $1064.84. Of these items of expense $5193.92 was devoted to the maintenance of the auditorium—the portion which it is claimed was rented with a view to profit. The record also shows that the total income from the entire building for the year amounted to $8943.50, of which the income from the auditorium was $1450. The total maintenance and expense of the entire building was $23,256.62. This included an item of $5778.10 for the office of the secretary. The evidence shows that the secretary arranged for three entertainments during the year, each given in the auditorium, which, though patronized principally by members of the masonic order, were open to the public. On the first there was a loss of $1299, on the second a gain of $570.83 and on the third a gain of $582.80, or a net loss on the three entertainments of $145.37.

Counsel for appellant argues that whether property is being leased with a view to profit does not depend, alone, upon whether the income therefrom is more or less than the expense of up-keep. And this is true. Such fact may,

however, be considered as evidence of the intention with which the property is leased. The evidence also shows that the uses to which the auditorium was put were such as to be of benefit to the community. In several instances no charge was made for the use of the auditorium. The Consistory uses it for a total of about two months per year for its ritualistic work. The lounge and club rooms are used continuously by Masons generally. The evidence also shows that it was the expressed purpose of the board of trustees in charge of the building that the charge for the use of the building should be such, only, as would meet the up-keep and expense of maintenance of the building for the period of its use. We are of the opinion that the record satisfactorily shows that the property was not leased or otherwise used with a view to profit.

Charity, in a legal sense, is not confined to mere almsgiving or to the relief of poverty and distress but embraces the improvement and happiness of man. A charitable use, where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well-doing and well-being of social man. (*People* v. *Walters Chapter D. A. R.* 311 Ill. 304; *Ould* v. *Washington Hospital for Foundlings,* 95 U. S. 303; *Varnum Chapter D. A. R.* v. *City of Lowell,* 204 Mass. 484.) The primary objects of the masonic lodge being benevolence and charity, such lodge is a charitable institution. (*Grand Lodge* v. *Board of Review,* 281 Ill. 480.) To determine whether property is exempt from taxation as a public charity within the provisions of the constitution the test to be applied is the primary use to which the property is put. (*First Congregational Church* v. *Board of Review,* 254 Ill. 220; *Grand Lodge* v. *Board of Review, supra.*) It is apparent from the record that this masonic organization expends its revenue for the purpose of furthering the charities of that organization. The fact that a charitable organization receives funds through the use of its property does not of

itself subject the property to taxation. It is the common practice of churches to ·hold entertainments and bazaars for the purpose of raising money, yet no one would argue that the church property is therefore subject to taxation. It is rather the use to which the income is put that marks the test. (*School of Domestic Arts* v. *Carr*, 322 Ill. 562.) In that case the school was supported by pay students, the proceeds from a public restaurant conducted by it and gifts from various people. Its property was held exempt from taxation as exclusively used for school purposes. In *Congregational Publishing. Society* v. *Board of Review*, 290 Ill. 108, the property sought to be taxed was used for the purpose of publication of books and Sunday school supplies. For the year in which the tax was sought to be levied its business in the city of Chicago amounted to approximately $200,000. The record for some years showed a profit, which in 1909 amounted to $8440.28. It was there announced that the ground on which all exemptions in favor of charitable institutions are based is the benefit conferred upon the public by them, and a consequent relief, to some extent, of the burden upon the State to care for and advance the interests of its citizens, and the property there sought to be taxed was held exempt. In *City of Chicago* v. *University of Chicago*, 228 Ill. 605, the dormitories and dining halls where the students paid fees for lodging and board were held not to be used for profit and exempt from tax. In *Monticello Female Seminary* v. *People*, 106 Ill. 398, a tract of land used by the seminary for promenade grounds, gardens, orchards, pastures and crop lands, when all the returns from the lands were used to supply the institution, was held exempt from taxation under the statute. It is clear from this record that the property involved in this case is being used for the furtherance of the work and ·teachings of Freemasonry and that it has not been leased with a view to profit. The fact that a charge is made for the use of a portion of the building, which in this case does not equal

the cost of up-keep of such portion, does not show that such building is being leased with a view to profit, and to hold that if any charge whatever is made for the use of the building the exemption is destroyed is to seriously limit the use and benefit of such a building to the community.

It is also argued that appellee is not itself a masonic organization but a holding corporation, and its property is not, therefore, within the exemption. It is clear that the actual owner of the property is the Consistory—a part of the masonic order. The property is used by masonic bodies, and each Mason of that vicinity is entitled to make use of the building. The property is that of the masonic order.

We are of the opinion that the record in this case discloses appellee's property to be within the exemption statute, and the judgment of the county court is affirmed.

*Judgment affirmed.*

DUNN and DEYOUNG, JJ., dissenting:

The value of the property involved in this case is nearly half a million dollars. Its exemption from taxation may not be important, but the announcement of a rule under which a large amount of property throughout the State may become entitled to exemption is important. Section 1 of article 9 of the constitution requires the General Assembly to provide such revenue as may be necessary by levying a tax by valuation so that every person and corporation shall pay a tax in proportion to the value of his, her or its property. The principle of taxation thus declared is that of equality and uniformity, so that every person shall pay a tax in proportion to the value of his property. This principle of taxation declared by the constitution requires every person and corporation to pay taxes on all his, her or its property in proportion to its value, and the legislature has no power to exempt any property from taxation except as the constitution has permitted it. The constitution itself exempts no property, but by section 3 of article 9 it

has given the General Assembly authority to pass laws exempting certain classes of property from taxation by the following language: "The property of the State, counties, and other municipal corporations, both real and personal, and such other property as may be used exclusively for agricultural and horticultural societies, for school, religious, cemetery and charitable purposes, may be exempted from taxation; but such exemption shall be only by general law." The only part of this section which can be claimed to be applicable to this case is the following: "such * * * property as may be used exclusively for * * * charitable purposes may be exempted from taxation; but such exemption shall be only by general law." This is a limitation on the power of the General Assembly, and it has no power, under the constitution, to exempt from taxation any property used in connection with any charitable purpose unless it is used exclusively for such charitable purpose. In the exercise of the authority thus granted to it by the constitution the General Assembly enacted section 2 of the Revenue law in regard to exemptions from taxation, which, so far as it concerns this case, is as follows: "All property described in this section, to the extent herein limited, shall be exempt from taxation, that is to say: * * * Seventh— All property of institutions of public charity, all property of beneficent and charitable organizations, whether incorporated in this or in any other State of the United States and all property of old people's homes when such property is actually and exclusively used for such charitable or beneficent purposes, and not leased or otherwise used with a view to profit; and all free public libraries."

It is the well settled law of this State that the burdens of taxation should fall equally upon all; that statutes exempting property from taxation must be strictly construed and cannot be extended by judicial interpretation, and that it devolves upon those claiming that specific property is exempt from taxation to show clearly that it ·is within the

contemplation of the law. (*People* v. *Western Seaman's Friend Society*, 87 Ill. 246; *People* v. *Ryan*, 138 id. 263; *People* v. *Wabash Railway Co.* id. 85; *Catholic Knights* v. *Board of Review*, 198 id. 441; *In re Walker*, 200 id. 566; *Supreme Lodge* v. *Board of Review*, 223 id. 54; *Congregational Publishing Society* v. *Board of Review*, 290 id. 108; *In re Allerton*, 296 id. 340; *People* v. *Walters Chapter D. A. R.* 311 id. 304.) In the case last cited the court mentioned the fact that the General Assembly had added to the provision of the constitution the word "beneficent," both as to the class of organization and the purposes for which property is used, and stated that the General Assembly was not authorized to add to or enlarge the meaning of the word "charitable," and the word "beneficent" cannot be regarded as designating a class of organizations or purposes not named in the constitution. It was further stated that statutes granting tax exemptions were to be construed strictly, and the exemptions must come not only within the terms of the statute but also the authority given by the constitution; that the legislative intention must have been to use the word as synonymous with "charitable," and it was incumbent upon the appellee to show that its organization and the use of its property came within the provisions of the constitution as "charitable." To establish the character of its organization as charitable the appellee offered in evidence its charter, which defined its nature and purpose as follows: "The object for which it is formed is to maintain a chapter house at Lewistown, Illinois, and in connection therewith a community rest room; to perpetuate the memory of men and women who have actively promoted and protected the interests of the community in the past, of those who have been prominent in the history of our county, State and country, and especially of those who achieved American independence, by the acquisition and protection of historical spots and the erection of memorials, and by the promotion of celebrations of patriotic anniver-

saries; to cherish, maintain and extend the institutions of American freedom and to foster true patriotism and love of country." The character of the property and the use made of it were shown as follows: "The residence property, upon which there was a brick residence building erected in 1842, had some historical value. It was near the center of the city and near the court house and convenient for maintaining a rest room and community gatherings. A rest room was established, provided with a public toilet, chairs and tables, where people might rest and eat their lunches. The building was in charge of a hostess, and the rest room was open to the public from 6:30 A. M. until 9:00 P. M., except on Sunday, when it was open from 9:00 A. M. to 9:00 P. M. In the year preceding April 1, 1922, more than 20,000 people made use of the community rest room, and whenever the number was such as to require it, the entire building, with the exception of a part of the second floor, was open to the public. No part of the premises was leased or otherwise used with a view to profit but two rooms were rented to lodges, producing an income of $132 a year, which was devoted to the purposes of the organization. The officers received no compensation and the members paid annual dues, which were received by the State chapter, from which it furnished aid to schools, and this chapter aided in supporting a school. There was a mortgage on the property, and on occasions some of the rooms were rented to private organizations for entertainments, and tablets were sold to perpetuate the memory of men and women who had been concerned in the building of the community and who were voted by the chapter worthy of having tablets erected to his or her memory. Eight tablets had been so erected, at $100 each. Other funds were secured by donations and by serving meals and banquets, and all revenues from any sales were devoted to paying for the property and the purposes of the chapter. At Christmas time the building was also devoted to aiding the poor and needy by pre-

paring baskets containing food furnished by the American Legion and goods and toys donated, and the baskets were distributed among the needy of the community. It was the plan and intention of the chapter to fit up a memorial room as soon as funds should be sufficient, wherein would be placed such historical books, manuscripts and war relics as could be secured."

Two things are essential to the exemption from taxation of property used for charitable purposes: one, the constitutional requirement that the property shall be used exclusively for charitable purposes; the other, that it shall be the property of a charitable organization. The judgment, therefore, turns upon the two questions whether the objector is an organization for charitable purposes, and whether the property against which judgment is sought is used exclusively for charitable purposes. These are questions of fact to be determined from the evidence in this case.

The first question (as to the organization of the objector, the owner of the property, and its purposes,) is to be determined by its certificate of incorporation. It is a corporation originally organized on August 9, 1904, as Freeport Consistory, Supreme Princes of the Royal Secret. The Corporation act of 1872, under which the objector was organized, required of the corporators a statement of the object for which the corporation was to be formed, and if such object was clearly and definitely stated and was a lawful object the corporation might be organized and have and exercise all the powers necessary and requisite to carry into effect the objects for which it was organized. The purpose for which the objector was organized was stated to be, "to promulgate the teachings of Scottish Rite Masonry and to promote fraternity and benevolence, and to purchase, lease, erect and own a masonic temple for its lodge and club rooms." On January 14, 1927, the name of the objector was changed to Freeport Masonic Temple, Inc. It appears, therefore, that the object for which the objector

is organized is threefold: to promulgate the teachings of Scottish Rite Masonry, to promote fraternity and benevolence, and to purchase, lease, erect and own a masonic temple for its lodge and club rooms. The latter object can hardly be regarded as a charitable purpose—the purchase, construction and maintenance of a building for its own purposes, for its lodge and club rooms. Nor can we take judicial notice that the promulgation of the teachings of Scottish Rite Masonry is a charitable purpose. We may doubtless take judicial notice that Freemasonry is a widely extended secret fraternal organization of very high and ancient origin, but the very fact that it is a secret organization, with an esoteric ritual and ceremonies and teachings designed for and understood by the initiated, only, precludes the courts from taking judicial notice of the character of the objector, whether charitable or otherwise. Judges, even if members of the order, cannot take judicial notice of that which they know because they are members—which the general public does not know. To promote fraternity and benevolence is too vague and indefinite a description of an object to constitute a charity. A charitable purpose must refer to some specific form of conduct or course of action tending to promote the well-doing and well-being of social men.

It is said that the primary objects of a masonic lodge being benevolence and charity, such lodge is a charitable institution, citing *Grand Lodge* v. *Board of Review,* 281 Ill. 480. This language occurs in the opinion in the case cited, which further cites *Morrow* v. *Smith,* 145 Iowa, 514; but it was unnecessary to the decision in that case and does not justify the conclusion that every masonic organization is a charitable organization or that judicial notice can be taken that any masonic lodge or organization is a charitable institution. In the opinion in *Grand Lodge* v. *Board of Review, supra,* it is expressly stated that it was not denied that the Masonic Home is a charitable organization, but

the objection insisted upon was that the home was not a public charity because its benefits were restricted to Master Masons, their widows and orphans. After stating the question two pages are devoted to the consideration of it, ending with the conclusion, "the Masonic Home is a public charity." This was what was decided in that case, and this question, and the question whether the lands claimed to be exempt were actually and exclusively used for the charitable purposes of the institution, were the only controverted questions in the case. That they were properly decided can not be denied.

The case of *Morrow* v. *Smith, supra,* involved the question of the exemption from inheritance tax under the statute of Iowa of a devise of real estate to the Ottumwa Lodge A. F. & A. M. for the purpose that the devisee use the income for charity. The only question in the case is said to be whether this masonic lodge is a charitable institution, and it is further said, "the question thus presented is one of mixed law and fact." The opinion then discusses in detail the evidence as to the extent, character and method of administration of the charitable services rendered by the lodge, which was the defendant in that case, and states: "We are constrained, therefore, to hold that the defendant, in its relation to this devise, is a 'charitable institution' within the meaning of this section." The court did not hold, as might be supposed from its citation in *Grand Lodge* v. *Board of Review, supra,* either that the primary objects of a masonic lodge are benevolence and charity or that a masonic lodge is a charitable institution. It carefully limited its decision to the particular lodge concerned in that case and to the evidence in that case, saying: "What we have here said as to the character of the lodge in question is based wholly on the evidence in this record. The writer of this opinion is unhampered by independent knowledge on the question and is happily dependent on the record for all facts relating to the subject." It is thus evident that the

court did not take judicial notice that a masonic lodge was a charitable institution and did not decide any such proposition. While it may be properly said that a masonic lodge has been frequently held to be a charitable institution, it cannot be correctly said that it has been quite uniformly held by the courts that the primary objects of a masonic lodge are benevolence and charity or that a masonic lodge is *ipso facto* a charitable institution. It may properly be said that in a number of cases a particular masonic lodge has been held to be a charity or a charitable institution, but in each case the question was treated as in *Morrow* v. *Smith, supra,* as a mixed question of law and fact and was determined according to the evidence in the particular case.

The temple which the objector was incorporated to build was completed on December 12, 1928, at a cost of $492,-893.53. It is subject to a mortgage for $105,000 and there is a bank indebtedness of $25,000. The income of the corporation consists of the annual dues of its 2855 members at $10 each, and initiation fees and income from the rent of various parts of the building and its equipment. During 1929 the two lodge rooms were used by several masonic organizations. These were Excelsior Lodge No. 97, Evergreen Lodge No. 170, (which are blue lodges,) Freeport Council No. 39, Freeport Consistory No. 7, Freeport Chapter No. 3, Eastern Star No. 303, Capernaum Shrine No. 4, Freeport Chapter of Boy Builders No. 91, and the Consistory Auxiliary, which is a ladies' organization. These lodges paid rent for the use of the lodge rooms. In addition to the 2855 members of the Consistory, every Mason has the privilege of coming into that building, being 2738 other Masons, making 5593 in all. The rent paid by these masonic organizations for the use of the lodge rooms was $3955 and $2047.50 for the use of other portions of the temple, and $2940 was collected from sources other than masonic, for the use of the auditorium, ball and banquet hall, small dining room and lounge, making a total of

$8942.50 rent received. During the year the objector gave three entertainments open to the general public, for which admission fees were charged. They resulted in a net loss of $165.57. The objector also used the auditorium for its own purposes twice a year, in the spring and fall, three days each, and for a month before each meeting for rehearsals. The benefactions of the objector outside of the masonic order consisted of giving the use of a part of the building for a "father and son" banquet, of giving the use of the auditorium once to the high school band and once to the Lincoln-Douglas Society, and subscriptions (whose amounts are not shown) to the Amity Society, Boy Scouts, Y. W. C. A. and the King's Daughters' Orphans' Home. The expenses for maintaining the temple were $23,256.62, of which $5778.10 was paid to the secretary and book-keeper.

There is no evidence in this record to show the character, purpose and extent of the objector's charities except the testimony of its secretary that "Masonry teaches and encourages higher thoughts, nobler deeds, charity and beneficence to all mankind. It teaches men to live better lives, morally, religiously and physically." There is no evidence of the character and purpose of the objector except the certificate of its incorporation, and no evidence of its charities except the testimony of the same witness that in addition to the charitable work that the Consistory does among its own members it has always subscribed to the Amity Society, Boy Scouts, Y. W. C. A. and the King's Daughters' Orphans' Home. It is not shown that it has done any charitable work among its own members, and it is not shown that its subscriptions to any of the charities named by the secretary were of any substantial amount, and they must therefore be regarded as inconsiderable.

The case of *Scottish Rite Building Co.* v. *Lancaster County,* 106 Neb. 95, involved the question whether the building known as the Scottish Rite Cathedral, in Lincoln, Nebraska, was exemped from taxation under the law enacted

by the legislature under the authority of the constitution providing: "The following property shall be exempt from taxes: First, all property of the State, counties and municipal corporations; second, such other property as may be used exclusively for agricultural and horticultural societies, for schools, religious, cemetery and charitable purposes." It was argued that entirely apart from any material benefactions, since the Scottish Rite bodies in their ceremonials instruct their members in the precepts of duty to others and in kindliness and fraternal feeling, the building in which such principles are taught would be, for that reason, used for charitable purposes. It was held, however, that the words "charitable purposes" were not intended to have so broad a signification and were not intended to include the expression or inculcation of charitable sentiments, thereby giving a merely subjective meaning to the words "charitable purposes," but what those words meant was concrete, practical, objective charity, manifested by things actually done for the relief of the unfortunate and the alleviation of suffering or in some work of practical philanthropy, as contrasted with the sentimental or ethical standpoint. The question of fact, therefore, which was considered was whether or not the building in question was in a practical sense used for charitable purposes, and it was held that it could not be considered so used unless charity was actually dispensed there or unless it provided necessary quarters for an organization whose prime purposes and functions were actively charitable. The court proceeded to a discussion of the evidence, which disclosed a state of facts very closely similar to the facts in the present case. The building covered about 100 by 142 feet of ground and cost $150,000, of which $82,500 was originally represented by a debt incurred, which at the time of the hearing had been reduced to $36,000 by the application thereon of initiation fees and dues. It contained a reception hall, ladies' room, cloak room, smoking room, a large room for conferring

degrees, a dining hall for a thousand people, pantries and heating plant. About fifty meetings were held there annually by the Scottish Rite bodies, four in number, and the affiliated masonic orders, the Mystic Shrine and the Eastern Star. The Scottish Rite used the building about twenty-five days and the Mystic Shrine about eighteen days each year, and both used it to hold initiation ceremonies of large classes, requiring sessions of several days. The building was occasionally permitted to be used by outside bodies but no rent was charged. The income of the Scottish Rite consisted of initiation fees, amounting to $150 for all the degrees, and annual dues amounting to about four dollars. About one-third of the initiation fees is expended in entertainment during the initiation ceremonies and in fees to the Supreme Council, and the remaining third and the four dollars dues go into the general lodge fund. For the two years preceding the hearing of the case in the court, the surplus remaining after the payment of expenses was transferred by the Scottish Rite bodies to the building fund and used in paying for the cathedral. No fixed percentage of the revenue was set aside for charity. Some appropriations were made out of the general fund for that purpose, the amount of which is not shown, but it is inferred that the amount is inconsiderable. The conclusion reached was that the Scottish Rite Cathedral was not engaged in practical charity as its principal object, and its dominant purpose was not the dispensation of actual relief to the unfortunate or suffering or to some work of practical philanthropy, and was therefore not exempt from taxation under the statute.

Under conditions of fact substantially similar but under somewhat varied statutory provisions for the exemption from taxation of the real estate of charitable organizations used by them for their charitable purposes, it has been decided in the following cases that where an organization maintained an expensive building and furnishings for the maintenance of a private club for the use and social en-

joyment of its members rather than as a headquarters for the dispensation of charitable relief and the largest part of its income is applied to club purposes, though a part of it may have been applied to the relief of distressed members, it was not a charitable organization and its property was not exempt from taxation on that ground. (*Boston Lodge No. 10, B. P. O. E.* v. *City of Boston,* 217 Mass. 176; *Green Bay Lodge No. 259, B. P. O. E.* v. *Green Bay,* 122 Wis. 452; *St. Louis Lodge No. 9, B. P. O. E.* v. *Koeln,* 262 Mo. 444.) In all these cases the court held the maintenance of premises for a club room, for a restaurant, for social enjoyment, entertainment and amusement of the members of the organization and their friends not to be a charitable use. In two cases the majority of the Supreme Court of Colorado and the majority of the Supreme Court of Utah arrived at the opposite conclusion. (*Horton* v. *Colorado Springs Masonic Building Society,* 64 Colo. 529; *Salt Lake Lodge No. 85, B. P. O. E.* v. *Groesbeck,* 40 Utah, 1.) In both cases there were forcible dissenting opinions, and we agree with the views which they express.

It is to be borne in mind that the exemption under the statute of Illinois depends upon the exclusive use of the property for charitable purposes. If a part of it is not so used the whole of the property cannot be exempt even though the revenue from the part so used is applied to the charitable use, and if it is claimed that a part is exempt the burden is on the owner to show what part. It is apparent that the dominant use to which the real estate is put is not as a headquarters for the dispensation of charitable relief. It is immaterial in this regard whether any part of it is rented or used with a view to profit or not. If it is not used exclusively for charitable purposes it is not exempt. It is shown that the building and the lots on which it stands are worth, or at least cost, nearly half a million dollars. It is not shown that even so much as a hundred dollars was expended in charity. It is impossible that so expensive a

building has been devoted exclusively to charitable purposes with so small a benefit to charity, yet the record shows no more. It appears from the evidence that the objector received during 1929 rent amounting to $8942.50, of which $3955 was paid by various masonic organizations for the use of lodge rooms in the temple, $2047.50 for the use of other portions of the temple, while collections from sources other than masonic, for the use of the auditorium, ball and banquet hall, small dining room and lounge were $2940—an item not wholly inconsiderable or one which can be called merely incidental. The use which produced this income was not charitable. The entertainments given were not charitable, and, though no profit arose from them, the use was not exclusively charitable. It is impossible to understand how the private club room of the members can be called properly a charitable use. Neither the cost of its operation nor the returns received from it appear in the evidence and it is not shown whether it was operated at a profit or a loss. Whether it was the one or the other is immaterial. It was not a charitable use.

In our opinion the judgment of the county court was erroneous and it should be reversed, with directions to overrule the objections.