SCOTTISH RITE BUILDING COMPANY, APPELLANT, V. LAN-
CASTER COUNTY ET AL., APPELLEES.

FILED APRIL 20, 1921. No. 21211.

1. **Taxation**: EXEMPTIONS: "CHARITABLE PURPOSES." To be exempt from taxation as property used for charitable purposes, under section 6301, Rev. St. 1913, a building must provide necessary quarters and facilities for an organization devoted, as its domi- nant purpose, to the dispensation of actual relief to the unfor- tunate or suffering or to some work of practical philanthropy. The mere fact that the building is used as headquarters by a secret fraternal society which teaches charitable principles and encourages charitable sentiments among its members is not suffi- cient to constitute a use of the building for charitable purposes within the meaning of the statute.

2. ———: ———: ———. The Scottish Rite cathedral, the head- quarters of the Masonic order of that name in the city of Lincoln, is used for meetings and ceremonies of the Scottish Rite and affiliated Masonic bodies and has no other active use. Evidence relating to the revenues, disbursements, and charitable activities of the order examined, and *held* not to show that the Scottish Rite organization was engaged in practical charity as its principal object or to such extent as to warrant a finding that the building in question was used for charitable purposes.

3. ———: ———: "RELIGIOUS PURPOSES." The fact that members of a secret fraternal society are required to believe in the exist- ence of, and accountability to, a Supreme Being, and that, in their

meetings and ceremonies, prayers are said and the precepts of morality and duty to others are taught, will not characterize such society as a religious organization or exempt its property from taxation on the ground that it is used for religious purposes.

APPEAL from the district court for Lancaster county: LEONARD A. FLANSBURG, JUDGE. *Affirmed.*

*Burkett, Wilson, Brown & Wilson,* for appellant.
*Charles E. Matson, Harry R. Ankeny* and *Max G. Towle, contra.*

DORSEY, C.

This appeal involves the question whether the building known as the Scottish Rite cathedral, in the city of Lincoln, and the lots upon which it is located are exempted from taxation by the terms of section 6301, Rev. St. 1913, providing for such exemption in the case of property used exclusively for religious or charitable purposes. The property in issue was listed for taxation by the county assessor of Lancaster county for the year 1917. Objections upon the ground of the claimed exemption were filed with the board of equalization and overruled by that body. On appeal to the district court the action of the board was sustained and the property held subject to taxation. From that judgment this appeal is taken.

Section 2, art. IX of our Constitution of 1875, provides: "The property of the state, counties and municipal corporations, both real and personal, shall be exempt from taxation, and such other property as may be used exclusively for agricultural and horticultural societies, for school, religious, cemetery, and charitable purposes, may be exempted from taxation, but such exemptions shall be only by general law." Acting under this power the legislature of 1879 enacted the law which now appears as section 6301, Rev. St. 1913, which reads, in part, as follows: "The following property shall be exempt from taxes: First—all property of the state, counties and municipal corporations; second—such other property as may be used exclusively for agricultural and horticultural

societies, for schools, religious, cemetery, and charitable purposes." Statutes exempting property from taxation are to be strictly construed. *Young Men's Christian Ass'n v. Douglas County,* 60 Neb. 642.

The theory of the appellant, as developed in the argument of counsel, is, in substance, that the Masonic fraternity, in which the Scottish Rite bodies are included, is an order whose aims, objects and practices are mainly charitable and religious in character, and that whatever there may be in its aims and practices that is neither charitable nor religious is incidental merely and does not detract from its main purposes. Charity and religion are, therefore, so blended together in the organization that it may properly be termed exclusively charitable and religious, and the building in question, being devoted to the promotion of the objects of the order, is property used exclusively for charitable and religious purposes within the meaning of the statute.

With reference to that element of the appellant's theory which asserts that the organization is charitable and that the building was used for charitable purposes, it is contended that charity is not restricted, in its meaning, to alms-giving or financial relief, but includes all enterprises that produce no profit to the promoters, but tend to the improvement, welfare and happiness of mankind. It is argued, in that connection, that, entirely apart from any material benefactions, since the Scottish Rite bodies, in their ceremonials, instruct their members in the precepts of duty to others and in kindliness and fraternal feeling, thus encouraging those members who are depressed in spirit and stimulating them, not only to renewed efforts in their own affairs, but to take an interest in the welfare of others, the building in which such principles are taught would be, for that reason, used for charitable purposes. The following cases tend to support that conception of the meaning of the word "charitable:" *Cumberland Lodge, A. F. & A. M., v. Mayor and City Council,* 127 Tenn. 248; *Salt Lake Lodge, B. P. O. E., v.*

*Groesbeck,* 40 Utah, 1, Ann. Cas. 1914C, 940; *Horton v. Colorado Springs Masonic Building Society,* 64 Colo. 529.

While it is true that the thought expressed in the word "charity" is, in the language of the poet, the philosopher or the moralist, capable of many varieties and shades of meaning, the writer is convinced that it would be unreasonable to attribute to the framers of our constitution any intention to give so broad a signification to the words "charitable purposes" as that contended for by the appellant. They did not, in other words, intend to include in those words the expression or inculcation of charitable sentiments, thereby giving a merely subjective meaning to the word "charitable." What they meant, common sense teaches us, was concrete; practical, objective charity, manifested in things actually done for the relief of the unfortunate and the alleviation of suffering, or in some work of practical philanthropy, as contrasted with the sentimental or ethical viewpoint. The question of fact, therefore, is whether or not the building in question was, in a practical sense, used for charitable purposes, and it cannot be held to have been so used unless charity was actually dispensed there, or unless it provided necessary quarters for an organization whose prime purposes and functions were actively charitable. The following decisions, while rendered upon differing facts and statutory provisions, sustain, in a general way, the foregoing views: *Mt. Moriah Lodge, A. F. & A. M., v. Otoe County,* 101 Neb. 274; *Boston Lodge, B. P. O. E., v. City of Boston,* 217 Mass. 176; *St. Louis Lodge, B. P. O. E., v. Koeln,* 262 Mo. 444, L. R. A. 1915C, 694; *Vogt v. City of Louisville,* 173 Ky. 119; *Attorney General v. Common Council of Detroit,* 113 Mich. 388.

Let us now consider the evidence upon the question of fact involved. The building in question covers about 100 by 142 feet of ground, and cost $150,000. It contains a reception hall, ladies' room, cloak room, smoking room, a large room for conferring degrees, and, underneath the main floor, a dining hall for 1,000 people, pantries, and a

heating plant. About 50 meetings annually are held therein by the Scottish Rite bodies, 4 in number, and the affiliated Masonic orders, the Mystic Shrine, and the Eastern Star. The Scottish Rite uses the building about 25 days, and the Shrine about 18 days, each year. The building has been occasionally loaned to outside bodies, but no rental has been charged. The Scottish Rite and the Shrine use it to hold initiation ceremonies for new members, when large classes, averaging about 100, are put through the various degrees. The initiation of these classes requires sessions of several days, and during these periods meals and banquets are served in the dining hall at the expense of the Masonic organizations, without cost to the individual members. In addition, there are the regular monthly meetings of the Scottish Rite bodies.

The revenues of the Scottish Rite consist of initiation fees, amounting, in each instance, to $150 for all the degrees of the Scottish Rite, and the annual dues, amounting to about $4. Out of every $150 initiation fee, about $50 is expended in entertainment during the initiation ceremony and in fees remitted to the Supreme Council. The remaining $100 goes into the lodge general fund, and the $4 annual dues also.

For the two years preceding the hearing of this case in the court below, the surplus remaining after the payment of expenses was transferred by the Scottish Rite bodies to the building fund and used in paying for the cathedral. Of the $150,000, total cost of the building, there was originally a debt of $82,500, which at the time of the hearing had been reduced to $36,000 by the application thereon of initiation fees and dues. The Mystic Shrine, while temporarily using the cathedral, intend, it appears, to have a building of their own. Their initiation fee is $75, and the record shows that, after their expenses are paid and a small sum remitted to the Supreme Council, the remainder of their initiation fees and dues was placed in their building fund.

As to the active charity dispensed by these bodies, we

find that no fixed percentage of the revenues is set aside for charity. There is an almoner, who is the custodian of the funds set apart for charity and attends to their distribution. Voluntary contributions are taken up at every meeting, to be used for charity. Appropriations are sometimes made by a vote of the lodge, out of its general fund, for that purpose. The secretary of the Scottish Rite bodies summarizes the matter in his testimony: "Of course, we always take care of our brethren and their families. Our charitable work depends upon two things, first, of course, the amount of money we have available for charitable purposes; and, second, the amount of charitable work there is to do. Fortunately, in Lincoln here there is very little chance to spend money for charity. *   *   *   Q. Do you know how much this lodge has given out of the general fund by vote? A. I can't tell you the exact amount. We have not given any great amount in the last six or eight years, for the reason that we have never been asked for it. Every demand that has been made upon us has been promptly met, and the reason why we have not given more is because we have not been asked for it."

The leading facts from which it must be determined whether the building was, in fact, principally used for charitable purposes, as shown by the evidence, are that no fixed percentage of the revenue of the Scottish Rite or the Shrine was regularly set aside for charity; some appropriations were made out of the general fund for that purpose, the amount of which, the record does not show, but which the secretary's testimony leaves us to infer was relatively inconsiderable; voluntary contributions were habitually taken up at each meeting and disbursed by the almoner, the amount of which the record does not disclose; and two minstrel shows were given by the Shrine, presumably elsewhere than in the building in question, netting about $2,000 each.

The secretary's testimony makes plain that the disbursing of charity was not the principal object of the

organization. It was ready to respond to every call, but fortunately, as he says, there was little to do in the way of charity. It will readily be conceded that the organization and its membership were eager to extend assistance when called upon; but the attitude of the society was passive. It was not seeking out objects of charity beyond its own membership, and was in the charitable field only in the same way that any warm-hearted person might incidentally come in contact with need or suffering and hasten to relieve it. The Scottish Rite collected large sums, the surplus of which was enough to pay off nearly $50,000 of its building debt, but no fixed part of this was allotted to charity. All but a negligible amount of it was spent upon the building and in banquets and entertainments for its members and initiates.

There is no ground for reproach in this fact. It was perfectly appropriate for the society to cherish the desire for a magnificent abode for its ceremonies and for the accommodation of its membership, and it is not to be criticized for its hospitality toward initiates or in providing entertainment for its members in the promotion of their social intercourse. It is simply with reference to the aspect of the question which relates to the claim made here on behalf of the Scottish Rite, that it was principally a charitable organization and that its building was used chiefly for charitable purposes, that these observations are made, and there is no intention of intimating that it was deficient in discharging its charitable duties. Nevertheless, persons or institutions of wealth or means, however generous, who, even though they systematically allot a fixed part of their income to charity, are yet engrossed in pursuits and interests in which charity, while not entirely excluded, does not play a leading part, are not entitled to claim that they devote themselves chiefly to charity. Neither is a fraternal order entitled to claim exemption of its property from taxation because it encourages charity among its members and itself makes substantial donations to charity, when the evidence shows that its prin-

cipal activities were not in that direction, but were, for the most part, centered in promoting the interests and in gratifying the tastes of its own membership.

There remains to be discussed that element of the appellant's theory which depends upon the proposition that the building should be exempted because it was used for religious purposes. No judicial precedent is cited for so holding. The religious phase of the appellant's contention is founded upon the fact that the Scottish Rite degrees are conferred in great solemnity; that prayers are said and the candidate is taught and required to believe in God or a Supreme Being, to whom he owes reverence, loyalty, service, and honor; that he is taught that the soul is immortal and that he is accountable to the Supreme Being after death; that God is the Father and we are brethren who owe a mutual duty to each other, and that the purpose of the order is to make men better.

The theory that these facts with regard to the Scottish Rite ritual stamp it as a religious, as distinguished from a secular, organization indicates a misconception of the tenets and polity of the order which, with respect to the so-called religious features mentioned, are shown by the record to be the same as those of Masonry generally. The evidence shows that belief in and reverence for a Supreme Being are required of each and every member; that it makes no difference whether that Supreme Being is "God" or "Allah;" that belief in Christianity is not exacted, and that people may belong who do not believe in the divinity of Christ. The fact that belief in the doctrines or deity of no particular religion is required, of itself, refutes the theory that the Masonic ritual embodies a religion, or that its teachings are religious. Is it conceivable that the Scottish Rite bodies, or the Masonic order generally, set themselves up as exponents of a new religion? For if they belong to none of the old established religions, and yet assume to preach or expound religion, they must be embarking upon a new theology and setting up a religion of their own.

The true interpretation of the Masonic attitude in that respect is that no religious test at all is applied as a condition of membership. The guiding thought is not religion but religious toleration. The order simply exacts of its members that they shall not be atheists and deny the existence of any God or Supreme Being. Each member is encouraged to pay due reverence to his own God, the Deity prescribed by his own religion, and to obey those precepts of human conduct, which, while taught by all religions prevalent in civilized society, do not appertain to the mysteries or doctrines of any religion, as such, but are common to all. The Masonic fraternity, in other words, refrains from intruding into the field of religion and confines itself to the teachings of morality and duty to one's fellow men, which make better men and better citizens.

The distinction is clear between such ethical teachings and the doctrines of religion. One cannot espouse a religion without belief and faith in its peculiar doctrines. If a Christian, for instance, one must believe in the divine mission and revelation of the Saviour, with all that is implied and included therein; if a Mohammedan, one must believe in the revelation of the doctrine of that religion through the Koran, of which Mohammed was the prophet. A fraternity, however, broad enough to take in and cover with its mantle Christian, Moslem, and Jew, without requiring either to renounce his religion, is not a religious organization, although its members may join in prayer which, in the case of each, is a petition addressed to his own Deity. Neither can belief in the immortality of the soul be denominated religious, in the sense that it is typical of any religion, of any race, or of any age. It constitutes, to be sure, one of the most beautiful and consolatory features of our own religion, but it is equally to be found in almost every other. It is so universal and spontaneous that it is not so much a belief or dogma as it is an instinct of the human soul. Neither does it imply or require adherence to any system of religious worship;

many pagan and infidel philosophers have asserted it. It is so generally subscribed to by everybody that it does not run counter to any one's religious belief, and, as in the case of belief in the Supreme Being, the profession of belief in the immortality of the soul does not create any religious division among the members of the Masonic order.

It cannot but occur to the thoughtful mind that in putting forward the resemblance of its ceremonies to the observances of religious worship, and in claiming the right to exemption for its property from taxation upon that ground, counsel have assumed a position which, when carried to its final analysis, would, if sustained, go farther than the order itself has clearly contemplated, and would lead to results alike harmful and impracticable. For the Scottish Rite bodies to be pronounced by law, or court decision, religious organizations would mean that their meetings must be construed to be the equivalent of divine worship, and their officiating officers to be clergymen or ministers—of what gospel, it is impossible to say. Owing to the perfect liberty of conscience which people of every religious faith enjoy under our institutions, it has become a marked characteristic of religious worship in this country that it should be held in public and with open doors. It would be an anomaly, to say the least, if it should become the practice to give religious sanction to the meetings of secret societies and to rites and services carried on in the guise of religious worship to which the public would be denied admittance.

The fact that they display in their ceremonies a becoming reverence for the Deity and strive to inculcate the principles of morality does not change the essentially temporal or secular character of the Scottish Rite bodies, or clothe them with the spiritual or sacred attributes of a religious or ecclesiastical institution, any more than the custom of family prayers, or of religious or moral instruction in the home, would have that result. *St. Louis Lodge, B. P. O. E., v. Koeln*, 262 Mo. 444. The evidence

will not bear out the assumption that the ceremonies in question are religious rites or services.

The finding of the trial·court that the dominant use of the building has not been such as to establish that it was used chiefly, still less exclusively, for either charitable or religious purposes is .clearly right and should be affirmed.

PER CURIAM.    For the reasons stated in the foregoing opinion, the judgment of the district court is affirmed, and this opinion is adopted by and made the opinion of the court.

AFFIRMED.

TIBBETS, C., dissents.

FLANSBURG, J., and CAIN, C., not sitting.