ANCIENT AND ACCEPTED SCOTTISH RITE OF FREEMASONRY, APPELLANT, V. BOARD OF COUNTY COMMISSIONERS, APPELLEE. CONSOLIDATED IN DISTRICT COURT WITH ANCIENT AND ACCEPTED SCOTTISH RITE OF FREEMASONRY, APPELLANT, V. BOARD OF EQUALIZATION OF LANCASTER COUNTY, APPELLEE.

FILED FEBRUARY 19, 1932. No. 27568.

*Peterson & Devoe,* for appellant.

*Max G. Towle* and *Farley Young, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ.

EBERLY, J.

In complaints before the board of county commissioners and the board of equalization of Lancaster county, the Ancient and Accepted Scottish Rite of Freemasonry of Lincoln, complainant, prayed for an order striking from the tax lists for 1929 the real estate consisting of the Scottish Rite Temple and grounds at the northeast corner of Fifteenth and L streets in the city of Lincoln, on the statutory ground that the property described is exempt from taxation, for the reason that it is used exclusively for educational, religious or charitable purposes, and not for financial gain or profit to either the owner or user. Comp. St. 1929, sec. 77-202. The legal title to the real estate is held by the Scottish Rite Building Company and in that name the property was entered on the tax lists in 1926 at the assessed valuation of $110,000 and will remain thereon for the year 1929, unless stricken off. The equitable or beneficial owner is alleged to be the Ancient and Accepted Scottish Rite of Freemasonry, the legal title being held for convenience in the name of the Scottish Rite Building Company. The county board dismissed the complaints and allowed the property to remain on the tax lists for the purposes of taxation. Complainant appealed from the decision of the county board to the district court, where the alleged facts upon which the claims for exemption are based were put in issue by formal pleadings. Upon a trial the district court found that the Scottish Rite Temple and grounds were not used exclusively for religious, charitable or educational purposes within the meaning of the constitutional and statutory provisions re-

lating to exemption of property from taxation, refused to strike the property from the tax lists, and dismissed the complaints. From the judgment of the district court complainant appealed to the supreme court.

The question presented by the appeal is the asserted right of complainant to a decree in equity striking from the tax lists the Scottish Rite Temple and grounds as property exempt from taxation under the following constitutional and statutory provisions:

"The legislature by general law may exempt property owned by and used exclusively for agricultural and horticultural societies, and property owned and used exclusively for educational, religious, charitable or cemetery purposes, when such property is not owned or used for financial gain or profit to either the owner or user." Const. art. VIII, sec. 2.

"The following property shall be exempt from taxes: * * * Property owned and used exclusively for educational, religious, charitable or cemetery purposes, when such property is not owned or used for financial gain or profit to either the owner or user." Comp. St. 1929, sec. 77-202.

The evidence discloses that the appellant is a subordinate body to the Supreme Council of the Ancient and Accepted Scottish Rite of Freemasonry of the Southern Jurisdiction of the United States of America, the governing organization, and is a part of the general masonic structure; that the foundation or Blue Lodge of masonry has three degrees; that appellant confers the degrees from fourth to thirty-second inclusive. Another branch of masonry exists in the York Rite, commonly understood as Knight Templarism, which confers degrees peculiar to itself. The Scottish Rite Building Company is a Nebraska corporation, and holds title to the property here in suit for the sole use and benefit of appellant as representative of the subordinate bodies of the Valley of Lincoln, and has no power to devise or dispose of the same without the consent of the members of appellant organization and of the supreme authority governing subordinate bodies. The ap-

pellant, as a practical matter, exercises full and complete control of the property in controversy, which consists of a building of stone and brick construction covering about 100 feet by 142 feet of ground. This building contains general office quarters used solely for the administration of the order's affairs, a reception room or parlor, a lobby, a small and also a large lodge room, a banquet hall, together with paraphernalia rooms, music room, rooms for storage and for coal and heating apparatus. It is ordinarily referred to as the Temple and will so be hereinafter designated. It also appears that no portion of this Temple building is ever used for commercial purposes, but is devoted exclusively to the furtherance of the purposes of masonry. It is built with special reference to requirements of the work carried on by the Scottish Rite bodies, and is, with its appointments, absolutely necessary to the efficient and appropriate accomplishment of their purposes. In it is conferred the Scottish Rite degrees from the fourth to the thirty-second, and there is also held therein the business meetings of the included Scottish Rite masonic bodies. It is also used without charge by the Order of De Molay, which may be said to be approved, sponsored, and promoted by appellant, and having as its purpose, in part, the training of young men and boys for a better life, and which will tend to qualify them later to meet the requirements of masonry. It is also used by the Order of the Nobles of the Mystic Shrine (a masonic order), to whom none but Scottish Rite masons of the thirty-second degree and Knights Templars are eligible, for their business meetings and their biennial ceremonial sessions. The Shrine band maintained by this last named organization use it as their place of instruction and practice. The Temple building is also used by the Order of the Eastern Star, without financial remuneration, for their lodge purposes. This order may be said to be in the nature of an auxilliary masonic organization. Excepting the Shrine band, these societies are all ordinarily known as secret orders, and the only affairs carried on therein pertain or

are incidental to their lodge work. Educational and charitable activities and purposes are common, in fact identical, in both craft masonry and that of Scottish Rite, and to that extent they work together.

It is also unquestioned in the record that the Temple property is not owned or used for financial gain of either the owners or users, or of the individuals of the membership comprising the same.

The appellant, considered as a "lodge," is supported, maintained and carries on its work wholly out of the initiation fees, annual dues paid in by its membership, and voluntary contributions by them made. But membership as such, it appears from the evidence, is not the source of any financial return to the member.

A certain portion of the funds so received are, however, remitted to the Supreme Council, the parent body already mentioned. Indeed, the co-ordinated bodies of the Supreme Council, of whom the appellant is one, are the money gatherers of that body, and, excluding devises and other incidental contributions, are the sole and ultimate source of the funds distributed by that supreme organization. A summary of these expenditures comparatively recently made discloses not only the extent of this work on the part of the "co-ordinated bodies," but also the purposes to which the proceeds of the same were largely devoted by the Supreme Council, and is as follows: Paid directly for educational purposes $1,285,413.22 (including one million dollars to George Washington University, Washington, D. C.) ; for maintenance of hospitals $205,125.76; for masonic and other charities $307,779.22; for charitable relief $165,-740; for disasters, floods, fires, wherever occurring, $111,-565.09. The total of contributions so made to strictly educational and charitable purposes aggregates $6,318,016.15.

As to the portion of appellant's income not thus employed, it may be said that within the local orders, and as an instrumentality thereof, there is an organization known as the Scottish Rite Educational Welfare Association, separately incorporated, to which contributions are

made by appellant, the sole object and purpose of which is to assist worthy students in the completion of their education. This instrumentality now has at its disposal $60,000, all of which at the time of the hearing of this case in the district court, save and except the sum of $13,500, was in active use for the purposes supplied. There is also another subsidiary organization known as the Scottish Rite Relief Board, now possessing a balance of approximately $15,000 contributed by the appellant's membership, devoted wholly to charitable relief. All revenues received by appellant not used for maintenance of its building and defraying necessary costs and legitimate expenses in the administration of the Order's affairs are placed in a fund to be used when called for or required for educational and charitable purposes. In addition, there is a system of voluntary charitable contributions provided for, made by the membership in addition to regular and stated dues. Then, too, the evidence discloses without dispute that its charities are not limited to the membership of the Order, but extend to worthy objects without reference to their institutional affiliations.

If it be said that the matter of determining the precise and essential nature of the use of the Temple property by appellant as a lodge or fraternal society, excluding from consideration such portion of such use so far as the same pertains to the creation and perpetuation and administration of the charities enumerated, still remains to be accomplished, the answer is to be found in undisputed evidence submitted in this case. An epitome of the record on this point would include the following facts: (The term "masonry" as employed by the witnesses pertains to and embraces the work of appellant considered as a lodge or fraternal secret society.) Masonry is traditionally and generally described as a system of morality veiled in allegory and illustrated by symbols. It teaches as a foundation principle faith in God and immortality of the soul. Masonry is not sectarian in its religious teaching. It aims to bring its devotees a deeper and more conscious

contact with spiritual things. To the extent that religious purposes include the field of morals, masonry makes common cause with organized religion. Masonry is tolerant of all faiths and builds a moral and spiritual fellowship on the foundations of fundamental morality common to them. It brings its members to the altar of prayer, and by its every teaching and effort seeks to make real the invisible power of love, the intrinsic worth of harmony, and the beauty and eternal reality of the ideal. Outside of the activity of masonry which is devoted to charity, which constitutes a very substantial and major part of its endeavors, all of its activities in all of its bodies are devoted to those purposes which properly fall within the definition of "educational" and "religious." The positive testimony based upon the positive knowledge of the witnesses testifying in summarizing is that, measured by its purpose as exemplified by appellant, and as applied in its work as a lodge or society (to quote from the record before us), "Masonry falls entirely, without exception, within the three catagories of charity, educational purpose, and religious purpose. It has no other function or purpose and does no other work." Further, that the statements thus made "may be fully verified in every particular by reference to a large body of masonic literature available to any one who is interested in studying it, open to everybody, representing the best masonic thought for centuries back in time."

It further appears that these results are accomplished by and through the teachings of its rituals as employed in the conferring of its degrees, and in the transaction of its business, as well as by its literature.

On this evidence the trial court, in effect, held that a "religious purpose," within the meaning of the statutory and constitutional provisions involved in this case, requires an organization whose primary purpose is a sectarian organization holding open meetings, open to the public, and teaching a faith and belief in some particular or special doctrine of faith of some kind, as distinguished from other

accepted religious faiths; and that as the property was not used "exclusively for a religious purpose," as thus restricted, and by an owner identified with a class thus described, it was not subject to exemption, and as it was not used exclusively for charitable purposes it could not be exempted on that ground. In the disposition of appellant's claim based on the alleged use of the property for "educational purposes," the court, in effect, determined, in the light of *Young Men's Christian Ass'n v. Lancaster County*, 106 Neb. 105, that the building must be used for scholastic purposes, a "school." And appellant's property, not being devoted exclusively to a purpose within the judicial definition thus announced, was for this reason not subject to the exemption claimed.

It is to be observed that the case last referred to involved taxes assessed in 1917 and 1918, and a claim of exemption based in part on the words "school purposes," as those words were used in the statutes and Constitution then in force. Conceding that "school" is a generic term, and denotes an institution for instruction or education, a collective body of pupils in any place of instruction under the direction of one or more instructors (35 Cyc. 811), still the decision relied on, as to the present question, is wholly devoid of the force of precedent in the instant case. By constitutional amendment effective January 1, 1921, followed by a statutory amendment, the word "school" was eliminated and the word "educational" substituted therefor in both Constitution and statute controlling. Therefore the question of educational purposes was not, and could not have been, presented and decided in *Young Men's Christian Ass'n v. Lancaster County*, 106 Neb. 105. Furthermore, lexicographers and the courts agree in defining "educational" as pertaining to "education." The latter word taken in its full sense is a broad, comprehensive term and may be particularly directed to either mental, moral or physical faculties, but in its broadest and best sense it embraces them all, and includes not merely the instructions received at school, college, or university,

but the whole course of training—moral, intellectual, and physical.

An educational purpose is synonymous with an educational undertaking, and whatever educates is within the meaning of an "educational undertaking." 19 C. J. 1015; *Conley v. Daughters of the Republic,* 106 Tex. 80.

It would seem also to follow that if the achievements of this Order are dependent upon, or are in fact due to, instruction and training received by its initiates and membership, directed either to their mental or moral faculties, and in which the Temple is employed, to the extent of such use an educational purpose would be involved.

It would seem also a serious question is involved in the view announced by the trial court, in effect that the term "religious purpose" requires as a prerequisite to its application a society, approximating a sectarian organization, formed and maintained exclusively for religious purposes and using the property claimed as exempt, in the conduct of open meetings devoted to teaching a belief in some particular or special doctrine of faith, after the manner of the sectarian churches of the present day.

It is to be noted that the controlling language determines the exempt character of property solely by the "purpose" to which it is devoted. The identity and character of the owner is not in express terms constituted an element of the right involved nor made a prerequisite to its exercise.

Indeed, the pronouncement of the trial court appears wholly incompatible with the spirit of section 1, art. I of the Constitution; to the conceded "natural and indefeasible right" of the citizen "to worship Almighty God, according to the dictates of his own conscience;" as well as being a clear transgression of the constitutional inhibition which directs that "no preference shall be given by law to any religious society." Const. art. I, sec. 4.

"Religious purpose" is indeed synonymous with "religious worship," though of wider scope. On this subject a court of high standing has said: "Prayer is always worship. Reading the Bible and singing may be worship.

\* \* \* If these exercises of reading the Bible, joining in prayer and in the singing of hymns were performed in a church there would be no doubt of their religious character, and that character is not changed by the place of their performance." *People v. Board of Education,* 245 Ill. 334, 339. See *State v. Scheve,* 65 Neb. 853.

The conclusion follows that neither the profession of a sectarian creed, nor the formal dedication or occupation of property to promote the objects and purposes of a faith thus expressed, is an essential element of a "religious use," nor a necessary prerequisite to and of an "exclusive religious purpose."

The question of primary importance in this case, upon which all others must depend, is to determine what "uses" and "purposes" are exclusively "educational," "religious," and "charitable," as these terms are employed in the Constitution and statutes here applicable. In both it will be noted that connecting the terms "educational," "religious," and "charitable," the conjunction "or" is employed or implied. So used, "or" may be construed to mean "and" when necessary to make the statute express the true legislative intent; and similarly "or" may be construed as meaning "and" in constitutional provisions. 46 C. J. 1127; 2 Lewis' Sutherland, Statutory Construction (2d ed.) 756; 25 R. C. L. 977, sec. 226. Therefore, in the instant case, in view of the general purpose to be promoted, it may not be said that the right of exemption is dependent on the fact that the property involved was used for purposes exclusively educational, or exclusively religious, or exclusively charitable, construing the three conditions to be distinct and mutually exclusive. Reason would dictate that, if property is in fact used for no other purposes than those which are educational, religious, and charitable, it is plain that the conditions of the exemption have been strictly complied with, irrespective as to the matter of proportion which any one of these distinctive purposes may bear to the others.

It is also to be noted that our constitutional provision

and the statute passed pursuant thereto evidence a development. At the organization of the state, tax exemptions were not made a matter of constitutional regulation. They were first created and defined by the adoption by the territorial legislature of Nebraska of 1857, "of the thirty-seventh chapter of the Code of Iowa, entitled Revenue." This enactment provided in substance that the following should be exempt from taxation: "The grounds and buildings of library, scientific, benevolent and religious institutions or societies devoted solely to the appropriate objects of these institutions (within limits specified). * * * The books, papers, furniture, scientific, or other apparatus pertaining to the above institutions," and "money and credits belonging exclusively to such institutions, and devoted solely to sustaining them." Laws 1857, p. 147. Section 1, art. XI of the Constitution of 1866, continued this legislation "in force until altered, amended, or repealed by the legislature." And this enactment, as amended, still being in force at the time of the adoption of the Constitution of 1875, was further continued by the effect of section 1, art. XVIII thereof, in terms providing "that all laws in force at the time of the adoption of this Constitution, not inconsistent therewith, and all rights * * * of this state, individuals, or bodies corporate, shall continue and be as valid as if this Constitution had not been adopted." In this connection it will also be remembered that in 1873 there was duly enacted "An act for the incorporation of charitable societies," providing for their organization and incorporation "for any charitable purpose," and defining the "charitable purposes" to which their powers might be applied. This was also continued in force and effect by the constitutional provisions last referred to, and, as now amended, provides: "Charitable societies within the meaning of this chapter shall be construed to include only societies intended to assist those suffering from any disease, infirmity or necessity, and societies for the prevention of cruelty to children and animals and for their protection and for other humanitarian or benevolent purposes."

Comp. St. 1929, sec. 24-601. So, also, since 1907 the legis-
lature has provided for the incorporation of "All state,
grand, supreme or national, secret, fraternal, benevolent
or charitable orders, lodges," etc., and their respective
subordinate bodies, without any precise definition of the
terms "benevolent" and "charitable," etc., as employed in
this act, but expressly including the following: "The
Grand Lodge, Ancient Free and Accepted Masons; The
Grand Chapter of the Order of the Eastern Star, of the
State of Nebraska," etc. Comp. St. 1929, sec. 24-607.

It is to be observed that the terms of the exemption
statute and the constitutional restriction as between the
incorporated "charitable society" organized under the laws
of 1873, as amended, and the benevolent or charitable
order or lodge incorporated under the laws of 1907, as
amended, are strictly impartial, and both are placed upon
a plane of absolute equality. As to each the test for tax
exemption prescribed was, and is, that the "property" be
"owned and used exclusively for educational, religious,
charitable or cemetery purposes," and "not owned or used
for financial gain or profit to either the owner or user."
Though these terms are undefined, by context their mean-
ing is identical as applied to the two classes of corpora-
tions.

When the legislature later defined "charitable purposes,"
as employed in the act of 1873, as including assistance to
"those suffering from any disease, infirmity or necessity,
* * * and for other humanitarian or benevolent pur-
poses," it necessarily became a legislative construction to
the extent expressed (but not exclusive, however) of the
identical words as applied to the incorporated charitable
order or lodge. This conclusion is in accord with the
usual and accepted canons of statutory interpretation.

In the construction of the controlling statute in this
case it must be remembered that "No single statute should
be interpreted solely by its own words. Upon enactment
it becomes a part of, and is to be read in connection with,
the whole body of the law. Its interpretation is to be

in the light of the general policy of previous legislation and of the long-established principles of law and equity. * * * Even statutes on cognate subjects, though not strictly *in pari materia,* may be referred to, in order to elucidate the intention of the legislature in enacting any given statute." 25 R. C. L. 1052, sec. 277.

Indeed, this jurisdiction is committed to the doctrine that, in a case where the proper interpretation of the statutory terms is involved, in order to ascertain the proper meaning of a statute, later as well as earlier legislation upon the same subject may be referred to. All existing acts should be considered, and a subsequent statute may often aid in the interpretation of a prior one. *Campbell v. Youngson,* 80 Neb. 322; 36 Cyc. 1142.

And so, while it is a well-settled general rule that exemptions from taxation are to be strictly construed, and their operation is never to be extended by construction, the power and the right of the state to tax are always presumed, and the exemption must be clearly granted. This does not mean that there should not be a liberal construction of the language used in order to carry out the expressed intention of the fundamental lawmakers and the legislature, but, rather, that the property which is claimed to be exempt must come clearly within the provisions granting such exemption. 25 R. C. L. 1093, sec. 309; *Y. M. C. A. of Omaha v. Douglas County,* 60 Neb. 642; *House of the Good Shepherd v. Board of Equalization,* 113 Neb. 489; *Young Men's Christian Ass'n v. Lancaster County,* 106 Neb. 105.

In determining the legislative intent evidenced by the term "charitable purposes," as employed in, but not defined by, the constitutional and statutory provisions quoted, "in the light of the long-established principles of law and equity," we inescapably recur to the "Statute of Charitable Uses" (43 Eliz. cap. 4) enacted by the parliament of England in 1601, in part in the following language:

"Whereas lands, tenements, rents, annuities, profits,

hereditaments, goods, chattels, money and stocks of money have been heretofore given, limited, appointed and assigned, as well by the Queen's most excellent majesty, and her most noble progenitors, as by sundry other well-disposed persons; some for relief of aged, impotent and poor people, some for maintenance of sick and maimed soldiers and mariners, schools of learning, free schools, and scholars in universities, some for repair of bridges, ports, havens, causeways, churches, sea-banks and highways, some for education and preferment of orphans, some for or towards relief, stock or maintenance for houses of correction, some for marriages of poor maids, some for supportation, aid and help of young tradesmen, handicraftsmen and persons decayed, and others for relief or redemption of prisoners or captives, and for aid or ease of any poor inhabitants concerning payments of fifteens, setting out of soldiers and other taxes; which lands, tenements, rents, annuities, profits, hereditaments, goods, chattels, money and stocks of money, nevertheless have not been employed according to the charitable intent of the givers and founders thereof, by reason of frauds, breaches of trust, and negligence in those that should pay, deliver and employ the same: (2) for redress and remedy whereof, be it enacted by authority of this present parliament."

And as further evidencing the approved and ancient legislative employment of the term "charitable purposes," chapter 79, part V, 39 Geo. III, an act for the suppression of certain societies, expressly excludes lodges of freemasons from the sanctions thereof for reasons therein stated, as follows: "Whereas certain societies have been long accustomed to be holden in this kingdom under the denomination of lodges of freemasons, the meetings whereof have been in great measure directed to charitable purposes," etc.

True, the statute of 43 Elizabeth quoted created no new law on the subject of charitable uses, but merely provided a new and ancillary jurisdiction for their enforcement, which in due time, in England in fact, was largely super-

seded by an equitable procedure on information by the attorney general (3 Story, Equity Jurisprudence [14th ed.] sec. 1536), and ultimately repealed in 1908; and while its provisions for the administration of charitable uses are not now, and never have been, in force in this jurisdiction (*St. James Orphan Asylum v. Shelby*, 60 Neb. 796; *In re Estate of Nilson*, 81 Neb. 809) still it remains historically true that the preamble of the statute of Elizabeth quoted contains an accurate, though incomplete, enumeration of charitable objects or purposes recognized as such by the courts of equity of the English speaking nations, not only of that time, but during the years that have since intervened. It must, however, be admitted that "This list omits some most important and familiar charitable objects. * * * The English and American courts have never regarded this enumeration as exhaustive, but as designed to be merely illustrative. * * * The doctrine is settled that all particular objects embraced within the general spirit, intent, and scope of the statute are to be considered as charitable, unless they violate some rule of public policy or the provisions of some positive statute." 3 Pomeroy, Equity Jurisprudence (4th ed.) sec. 1020. "Numerous trusts for purposes of benevolence are upheld as charitable, although not mentioned in the statute, since they are within its spirit and intent." 3 Pomeroy, Equity Jurisprudence (4th ed.) sec. 1022. So, too, "gifts, devises, and bequests in trust for educational purposes are valid, since they are all clearly within the spirit of the statute." 3 Pomeroy, Equity Jurisprudence (4th ed.) sec. 1023.

In view of the import accorded the words "charitable purposes" since time immemorial, as evidenced by the ancient statutes, and as recognized, approved and applied by the general principles of equity, as well as the use, definition and employment thereof by our own legislature, we are constrained to the view that the words descriptive of the purposes which the controlling statute exempts must be construed not in their restrictive, but in their comprehensive, sense. So construed, the activities of appellant

fairly fall within the tax exemption provisions of our statute and Constitution.

In addition, it may be said that outside of this jurisdiction the courts of this country, proceeding "in the light of the long-established principles of law and equity," have, even before the adoption of our Constitution of 1875, almost universally recognized the benevolent and charitable purposes of Freemasonry, and adjudged it to be a charitable institution. *King v. Parker*, 9 Cush. (Mass.) 71; *Burdine v. Grand Lodge of Alabama*, 37 Ala. 478; *City of Indianapolis v. Grand Master, etc.*, 25 Ind. 518; *State v. Addison*, 2 S. Car. 499; *Mayor v. Solomon's Lodge, etc.*, 53 Ga. 93; *State v. Board of Assessors*, 34 La. Ann. 574. See, also, *Mayor v. Grand Lodge*, 60 Md. 280; *Morris v. Lone Star Chapter*, 68 Tex. 698; *City of Philadelphia v. Masonic Home of Pennsylvania*, 160 Pa. St. 572; *Fitterer v. Crawford*, 157 Mo. 51.

It appears, however, that under constitutional provisions restricting exemptions from taxation to "public charities" the following courts have held that masonic bodies that restricted their charity to their own were private as distinct from a "public charity," and therefore not exempt. *Bangor v. Masonic Lodge*, 73 Me. 428; *Morning Star Lodge v. Hayslip*, 23 Ohio St. 144; *City of Newport v. Masonic Temple Ass'n*, 108 Ky. 333; *Vogt v. City of Louisville*, 173 Ky. 119.

However, this court, in *Plattsmouth Lodge v. Cass County*, 79 Neb. 463, as opposed to the reasoning of the cases last above cited, held, under circumstances similar to those here set forth, that the property thus used was for a charitable purpose and exempt.

So, too, section 2, art. VIII of the Nebraska Constitution of 1875, as originally adopted, was exactly as heretofore quoted herein, except that, in lieu of the word "educational," the word "school" appears. As a matter of history it was adopted from the Illinois Constitution of 1870, and constitutes a verbatim copy of the tax exemption clause (section 3, art. IX) of that instrument. It will be

noted that the word "public" forms no part of this section, nor of the laws of this state enacted for carrying the same into effect. It will also be remembered that in the act of 1877, which was passed for carrying into effect the language of this constitutional provision, the legislature used the exact language of the Constitution. Also, when the constitutional amendment of 1920 of this section was adopted, the succeeding legislature immediately, by amendment to the existing revenue law, likewise employed the exact language of the Constitution as amended. This fact not only necessitates but accentuates the conclusion that the plain legislative intent, fairly expressed, is to exempt from taxation all property that the Constitution as now amended permitted them to exempt.

In the case of *Grand Lodge v. Board of Review,* 281 Ill. 480, the supreme court of that state had occasion to pass upon "what constitutes a 'public charity.'" While it appears that the constitutional provision of the state of Illinois relating to tax exemptions was at that time identical with the one later adopted by Nebraska, the statute passed by the legislature of Illinois pursuant thereto differed from the one before us, enacted by Nebraska, in that, as will be seen from the following quotation, the word "public" was employed therein. The discussion of the Illinois court on this branch of the case is as follows:

"The seventh clause of section 2 of the 'Act for the assessment of property and for the levy and collection of taxes,' as amended in 1915, exempts from taxation 'all property of institutions of public charity, * * * when such property is actually and exclusively used for such charitable or beneficent purposes, and not leased or otherwise used with a view to profit.' Laws 1915, p. 576. It has been quite uniformly held by the courts that the primary objects of a Masonic lodge being benevolence and charity, such a lodge is a charitable institution. *Morrow v. Smith,* 145 Ia. 514; Ann. Cas. 1912A, 1183, and note. That the Masonic Home is a charitable institution and that the property in question is devoted to charity is beyond ques-

tion and is not denied, but the objection made before the board of review and now insisted upon is that the home is not a public charity because its benefits are restricted to Master Masons, their widows and orphans, and that such limitation deprives the institution of the character of a public charity. That question has been argued by counsel (here follows a discussion of the proposition as presented) * * * A different conclusion was reached in *Widows and Orphans Home of Odd Fellows v. Commonwealth,* 126 Ky. 386, and *City of Indianapolis v. Grand Master of Grand Lodge of Indiana,* 25 Ind. 517, for reasons which appear to us to be sound.

"It is the duty of the public to care for the indigent and the poor who are sick and afflicted, and while the public burden is not for the relief of aged and indigent Masons as such, the public is not relieved from the burden because they are Masons, and any institution which serves no selfish interest, but discharges, in whole or in part, any such duty, is a public charity. To constitute a public charity the benefits must not be conferred upon certain and defined individuals but must be conferred on indefinite persons composing the public or some part of the public, but the indefinite class may be of one sex or the inhabitants of a particular city, town or county or members of a particular religious or secular organization. 5 R. C. L. 293; 11 C. J. 338. The fact of such discrimination among those members of the general public who need relief does not deprive the charity of its public nature."

The final conclusion of the Illinois court was: "The primary objects of a Masonic lodge being benevolence and charity, such a lodge is a charitable institution, and the Masonic Home of the grand lodge of Masons of Illinois, together with the land used for its maintenance, is exempt from taxation as the property of a public charity."

See, also, *Masonic Home v. Sedgwich County,* 81 Kan. 859; *Morrow v. Smith,* 145 Ia. 514; *Cumberland Lodge v. Mayor and City Council of Nashville,* 127 Tenn. 248; *State v. Packard,* 35 N. Dak. 298; *Hardin v. Rock Springs Lodge, A. F. & A. M.,* 23 Wyo. 522.

In this jurisdiction it is not the character of the owner but the nature of its use which must in each individual case furnish the test for determining the tax exempt character of the property involved. If that use be truly and exclusively religious, or exclusively educational, or exclusively charitable, or a combination of the three uses, and involves no other use, for the reasons expressed in the cases cited, we .are not concerned as to whether it be strictly a public charity or a private charity in the technical sense of these terms. *Plattsmouth Lodge v. Cass County*, 79 Neb. 463; *Young Men's Christian Ass'n v. Lancaster County*, 106 Neb. 105.

So, too, we are committed to the doctrine that, in determining whether or not property falls within a tax exemption provision, the primary or dominant use, and not an incidental use, will control. *House of the Good Shepherd v. Board of Equalization*, 113 Neb. 489; *St. Elizabeth Hospital v. Lancaster County*, 109 Neb. 104; *Central Union Conference Ass'n v. Lancaster County*, 109 Neb. 106; *Mary Lanning Memorial Hospital Ass'n v. Adams County*, 117 Neb. 618.

It follows that it fairly appearing from the evidence that the ownership as well as the primary and dominant use to which the Temple was devoted, at and for a number of years prior to the assessment of the taxes in suit, were exclusively for educational, religious, and charitable purposes, and that it was not owned or used for financial gain or profit to either owner or user, the district court erred in denying the claim for exemption.

It is to be noted that the material facts established by the evidence in the instant case differ ·in some important particulars from those recited in the opinion in *Scottish Rite Building Co. v. Lancaster County*, 106 Neb. 95. So, too, the controlling statute and constitutional provision relating to the subject of the action have both been amended since the case last referred to was decided. The case of *Mt. Moriah Lodge, A. F. & A. M., v. Otoe County*, 101 Neb. 274, determines only the insufficiency of the evidence

in that case to establish the right to exemption. However, to avoid any uncertainty which might otherwise arise, *Scottish Rite Building Co. v. Lancaster County*, 106 Neb. 95, and *Mt. Moriah Lodge, A. F. & A. M., v. Otoe County*, 101 Neb. 274, so far as in conflict with the conclusions here announced, are overruled.

For the foregoing reasons, the judgment of the district court is reversed and the cause remanded, with directions to enter a decree in conformity with this opinion.

REVERSED.