BETHESDA FOUNDATION, A NONPROFIT CORPORATION,
APPELLEE, V. COUNTY OF SAUNDERS, STATE OF
NEBRASKA, APPELLANT.

264 N. W. 2d 664

Filed April 12, 1978.   Nos. 41353, 41354, 41355.

William D. Sutter and Loren Lindahl, for appellant.

Stephen T. McGill, Ronald R. Volkmer, and Eugene T. Hackler, for appellee.

Moore, Moore & Peters, for amicus curiae Ashland-Greenwood School Dist.

Burke, Doerr, Erickson, Green, Grodinsky, Heaney, Hotz, McEachen, Rhodes, Sederstrom, & Seidler, for amicus curiae Eleven Omaha Attorneys.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, BRODKEY, and WHITE, JJ., and KUNS, Retired District Judge.

BRODKEY, J.

The issue presented in this appeal is whether a nursing home located in Saunders County, and owned and operated by the Bethesda Foundation,

was entitled to tax exempt status in 1972, 1974, and 1975 on the ground that it was owned and used exclusively for charitable purposes. The board of equalization of Saunders County denied Bethesda's application for tax exemption as a charitable organization in each of those years. Bethesda appealed to the District Court, which found that the property in question was owned and used exclusively for charitable and religious purposes, and that it was not owned or used for financial gain or profit to either the owner or the user. The District Court concluded that the board of equalization had erred in denying tax exemption to the nursing home. The County of Saunders has appealed to this court, contending that the District Court erred in concluding that the nursing home was exempt from taxation. We affirm.

The Bethesda Foundation is a Nebraska nonprofit corporation organized exclusively for charitable and religious purposes, and its specific purpose is to own and operate nonprofit homes for the physical, psychological, and spiritual care of elderly persons. Bethesda's articles of incorporation provide that no part of the earnings of Bethesda shall inure to the benefit of the directors, officers, or other private persons, except for reasonable compensation or fees for services rendered. The articles of incorporation also provide that upon dissolution of the corporation its assets shall be disposed of exclusively for the purposes of the corporation, or to organizations organized and operated exclusively for charitable, educational, religious, or scientific purposes so as to qualify for tax exemption under the Internal Revenue Code.

Bethesda operates more than 20 nursing homes in 7 states. Accounting, payment of salaries to employees, and general administrative tasks for all the nursing homes are performed at a central office in Millard, Nebraska. If revenue at a particular nursing home exceeds expenses, the net gain is used

elsewhere in the Foundation to offset net losses of homes where expenses exceed revenue. Bethesda maintains one consolidated annual balance sheet for all its operations, and, as an entity, its expenses have exceeded its revenue in past years. In 1975, for example, Bethesda had losses of more than $1,-000,000, and projected losses in 1976 were $400,000. To offset these losses, Bethesda has sought contributions from the public.

In 1971, Bethesda acquired the Ash Manor Nursing Home in Ashland, Nebraska. Bethesda replaced an antiquated structure with a new building, and Ash Manor is now a modern, 91-bed facility. It is licensed by the Department of Health of the State of Nebraska as an Intermediate Care Facility I. The admission policy of the home is nondiscriminatory, and the only requirement for admission is certification by a physician that the patient is in need of nursing care. Ash Manor accepts applicants on a "first come, first serve" basis, and ability to pay is not a consideration for admission.

Every person living at Ash Manor requires nursing care, which is provided by 2 registered nurses, 4 licensed practical nurses, 23 nurse aides, and 2 physical therapists. Much of the care administered to patients at Ash Manor is analogous to hospital care, and many of the patients would require hospitalization if they were not in Ash Manor. Many of the patients are not ambulatory, and many must be hand-fed.

Patients who are able to pay are charged $15, $16.25, or $17.50 per day, depending on the degree of care they require. At the time of trial, Ash Manor had 35 private pay patients. The other 56 patients received Medicaid benefits in the amount of $12.71 per day, but this Medicaid reimbursement does not cover the cost of caring for Medicaid patients. No patient has ever been removed from the home for refusal or inability to pay, and no law suit has ever

been commenced to collect payment from a patient.

Accounting statements indicate that Ash Manor's expenses exceeded revenue by approximately $3,700 in 1975. Two statements for 1973 and 1974 indicate that revenue exceeded expenses by about $44,000 and $28,000 in those years, but those figures do not reflect a ratable share of general office overhead or interest on general obligation debts allocable to Ash Manor, as did the 1975 figures. Bethesda's chief executive officer testified that if the latter two considerations were taken into account, there would have been little, if any, net income at Ash Manor in 1973 and 1974. Any excess revenue which did exist would be used to cover losses at other Bethesda nursing homes. Employees at Ash Manor are compensated at rates comparable to those paid in similar institutions. The administrator, for example, receives $900 per month.

The evidence at trial also showed that religion plays an important role at Ash Manor. An interdenominational religious service is held every week, and there are daily Bible study sessions. The staff provides transportation for those patients who wish to attend a local church. Pastors from local churches agreed that there was a religious atmosphere at Ash Manor.

Property owned and used exclusively for religious, educational, or charitable purposes is exempt from taxation when such property is not owned or used for financial gain or profit to either the owner or user. Art. VIII, § 2, Constitution of Nebraska; § 77-202, R. R. S. 1943. It is the primary or dominant use, and not an incidental use, of the property which is controlling in determining whether property is exempt from taxation under section 77-202, R. R. S. 1943. Lincoln Woman's Club v. City of Lincoln, 178 Neb. 357, 133 N. W. 2d 455 (1965). If the property in question is used for no other purposes than those which are educational, religious, and charitable, the conditions of exemption have been complied with, irre-

spective of the proportion which any one of these distinctive purposes may bear to the others. Lincoln Woman's Club v. City of Lincoln, *supra;* Ancient & Accepted Scottish Rite v. Board of County Commissioners, 122 Neb. 586, 241 N. W. 93 (1932). The question presented in the present case is whether primary or dominant use of Ash Manor was for religious and charitable purposes in the tax years in question.

In Evangelical Lutheran Good Samaritan Soc. v. County of Gage, 181 Neb. 831, 151 N. W. 2d 446 (1967), this court determined that a nursing home was entitled to tax exemption in a case with facts similar to those in the present case. In Good Samaritan the owner of the nursing home was a nonprofit corporation organized for purposes similar to those for which Bethesda was organized, and which operated a number of institutions in several states. The nursing homes in Good Samaritan provided nursing care to patients similar to that provided by Ash Manor, and the requirements of the patients in both cases are analogous. The nursing home in Good Samaritan, like Ash Manor, had both private pay and welfare patients, and sometimes revenue exceeded expenses. Surplus revenue at one home would be used to offset losses at another home.

In Good Samaritan this court concluded that the nursing homes were charitable institutions, noting that the concept of charity was broad enough to include practical enterprises for the good of humanity operated at a moderate cost to those who receive benefits. We found that nursing homes are analogous to hospitals which are universally classed as charitable institutions. The rule adopted by this court in Good Samaritan is one followed in other jurisdictions. See, City of McAllen v. Evangelical Lutheran Good Samaritan Soc., 530 S. W. 2d 806 (Tex., 1975); Annotation, Nursing Homes as Exempt from Property Taxation, 45 A. L. R. 3d 610.

Appellant attempts to distinguish this case from Good Samaritan on the grounds that Bethesda has been involved with profit-making ventures and has used revenue from its nursing homes for the financial gain or profit to officers of Bethesda. Appellant relies primarily on Bethesda's association with a construction company and with an aviation company. The construction company, Turcon, Inc., was formed by officers of Bethesda for the purpose of building nursing homes for Bethesda at cost. After constructing numerous nursing homes for Bethesda at cost, as well as occasionally performing work for other organizations, Turcon went out of business in 1972. At that time Bethesda absorbed the company's assets and debts. Although the debts absorbed were substantial, the founder of Bethesda, who was a shareholder in Turcon, made a gift to Bethesda of real estate which had a value exceeding the debts of the construction company. There is no evidence that Turcon was used by officers of Bethesda as a conduit for syphoning off funds from Bethesda. In fact, the evidence indicated that the shareholders of Turcon lost their funds used as capital when Turcon was formed.

The aviation company was formed by Bethesda as a means to minimize the cost of maintaining airplanes used by Bethesda employees for business purposes. The purpose of the company was to form a charter service to produce income when Bethesda's planes were idle, and thereby offset the cost of the planes. The company was never successful, and Bethesda was terminating its operations at the time of trial. There is no evidence that the aviation company was used as a conduit for placing Bethesda funds in the hands of private parties.

We do not believe that Bethesda's association with the two companies distinguishes this case from Good Samaritan. The issue in this regard is whether the Ash Manor property is being owned and used for fi-

nancial gain or profit to either the owner or user. The association with the companies was for the purpose of minimizing Bethesda's costs, and did not in fact result in financial gain or profit to either Bethesda or the officers of Bethesda.

Appellant also argues that the chief executive officer of Bethesda, Reverend Charles Turner, has obtained unwarranted personal benefits from Bethesda. Appellant relies on such incidents as Turcon having built a house for Turner at cost in 1968, Bethesda paying the cost of renting an auditorium where Turner gave a speech, and Bethesda loaning money to Turner's former church. None of these is compelling in view of the fact that there is no evidence that Turner himself received financial gain or profit from Bethesda. It should be noted that Turner has contributed land, money, and services to Bethesda since it was founded. At no time has he received compensation at a rate higher than that received by officers in comparable institutions, and in many years he has received little or no compensation.

We conclude that the Good Samaritan case is controlling. Under the reasoning of that case, we conclude that the Ash Manor property is owned and used exclusively for charitable purposes within the meaning of section 77-202, R. R. S. 1943. The record does not support the view that the property is owned or used for financial gain or profit to either the owner or user. Therefore the judgment of the District Court is affirmed.

AFFIRMED.

SPENCER, J., dissenting.

I respectfully dissent from the majority opinion herein. What I predicted in my dissent in Evangelical Lutheran Good Samaritan Soc. v. County of Gage, 181 Neb. 831, 151 N. W. 2d 446 (1967), is coming true in this case because this case goes even further than Good Samaritan. There, I said: "If this opin-

ion stands, every nursing home in the state, by incorporating as a nonprofit corporation, can avoid taxation and still drain off all profits in salaries and expenses.''

The Bethesda Foundation operates other nursing homes and businesses. Its operating revenue and expenses are all controlled by the central office of the Foundation and all its separate institutions are shown on one consolidated annual balance sheet and Internal Revenue Service form. If one nursing home operation shows a net gain from operations, this gain is used somewhere within the Foundation to offset those operations of the Foundation which show a net loss. While the evidence shows the Foundation has been having serious financial problems, the evidence also shows that Ash Manor Nursing Home, standing by itself, has in fact been a profitable operation.

Although the Foundation is organized as a nonprofit corporation, it owns and has been involved with various profit-making ventures. Specifically, the Foundation has been engaged in farming operations in Central City, Nebraska; and the sporting goods business and the commercial laundry business, both in Ainsworth, Nebraska. The witness didn't know whether these were profitable businesses, but they neither lost nor made any large sums. The Foundation has bought and sold nursing homes at various times, including those organized on a profit basis.

The Foundation presently owns all the stock of B. F. Aviation which is a private profit corporation. B. F. Aviation operates a charter airline service for private charter as well as for the Foundation, and at least 50 percent of its business is with customers other than the Foundation. The Foundation owned three airplanes before B. F. Aviation was formed. It now owns five airplanes which are presently worth somewhere in the neighborhood of $600,000, and the

record indicates it is contemplating purchasing another aviation company. The founder of the Bethesda Foundation and members of his family are officers of B. F. Aviation. B. F. Aviation has not been profitable to date. Money from profitable segments of the operation of the Foundation, such as the nursing home involved herein, which have been funneled through the central office of the Foundation, have been used to finance B. F. Aviation.

In addition to the profit-oriented enterprises above described, the Foundation has had a close association with a private corporation called Turcon, Inc., which was in the construction business. This corporation is of particular interest because it was operated and primarily owned by petitioner's founder, Mr. Charles Turner. In addition to building nursing homes for the petitioner, this company also engaged in many private construction activities, including the construction of Mr. Turner's personal home at cost; the construction of sewer lines; and a swimming pool for the city of Bellevue. Turcon also loaned money to its officers, including Mr. Turner. Eventually, Turcon was absorbed by the Foundation and Turcon's assets were transferred to the Foundation. Of particular interest in this case is that the Foundation, on a form filed with the Internal Revenue Service, took a bad debt expense in excess of $151,000. A portion of this amount was attributable to money owed by Turner to the Foundation when Turcon was phased out. Mr. Turner not only headed both the Foundation and Turcon but he also employed members of his family at Turcon.

It is important to keep in mind that in interpreting and applying constitutional and statutory provisions relating to exemption from taxation, the rule of strict construction applies. It is the burden of the taxpayer to show that the property involved is clearly within the claimed exemption. I cannot bring myself to believe that money from nonprofit corpo-

rations can be used in any way to support a profit enterprise and the nonprofit corporation be eligible for tax exemption.

The constitutional provision involved herein, Article VIII, section 2, provides in part as follows: "The Legislature by general law may exempt * * * property owned and used exclusively for educational, religious, charitable, or cemetery purposes, when such property is not owned or used for financial gain or profit to either the owner or user."

It is to be noted that the Legislature may only provide exemption if the property is owned and used exclusively for educational, religious, charitable, or cemetery purposes. The word "exclusively" is one of general understanding and certainly should preclude the exemption granted herein.

In Todd v. County of Box Butte, 169 Neb. 311, 99 N. W. 2d 245 (1959), this court said: "Statutes exempting property from taxation are to be strictly construed, and one contending that his property is exempt from such tax must show clearly that he is within the exceptions provided by statute."

Quoting from the majority opinion herein: "In Good Samaritan this court concluded that the nursing homes were charitable institutions, noting that the concept of charity was broad enough to include practical enterprises for the good of humanity operated at a moderate cost to those who receive benefits." In this respect it is important to note that the charges at Ash Manor are equal to those of non tax-exempt nursing homes. Furthermore, it is to be noted that when Ash Manor receives an indigent person it subsequently applies for and always receives Medicaid payments retroactive to the time that person became a resident. The charity dispensed by Ash Manor is no more nor less than that which will be dispensed by all nursing homes, whether tax exempt or otherwise. Tax exemption, therefore, makes these nonprofit institutions more competitive

than the private operators with whom they compete, and could eventually eliminate those operators.

The intent of the law is not to exempt every non-profit corporation which may be of some benefit to mankind. In the instant case the facts demonstrate that, although the nursing home was organized on a nonprofit basis, it is so similar to nursing homes being operated on a profit basis that an exemption should not be granted.

By the majority opinion this court imposes a burden on the taxpayers of the communities where these so-called nonprofit nursing homes are located to help support any business organized for profit or otherwise which the Bethesda Foundation sees fit to operate.

As I suggested at the outset, by the mere expedient of incorporating as a nonprofit corporation, every nursing home in the state may compel the taxpayers of the community in which it is located to support its enterprise. The majority opinion goes too far -- much too far.

WHITE, C. J., and KUNS, Retired District Judge, join in this dissent.