Appeal of **BERT R. McREYNOLDS,**　　　　　**Docket No. 660.**
　　　　executor of the last will
　　　　a n d 　 testament 　 o f
　　　　**HARDEN J. BROWN,**
　　　　deceased.

Under section 403 (a) (3) of the Revenue Act of 1921, a residuary bequest to a consistory of the Ancient and Accepted Scottish Rite is not a bequest to a corporation organized and operated exclusively for religious and charitable purposes, and may not be deducted from the gross estate in determining the value of the net estate subject to the tax.

Submitted February 5, 1925; decided March 18, 1925.

*William R. Bach, Esq.*, for the taxpayer.
*W. Hall Trigg, Esq.*, for the Commissioner.

Before GRAUPNER, LITTLETON, and SMITH.

This is an appeal from a deficiency letter dated October 11, 1924, asserting an estate tax in the sum of $643.23 on the estate of Harden J. Brown, deceased. The executor claims a deduction from the gross estate of a certain bequest to the Bloomington Consistory of the Ancient and Accepted Scottish Rite, Bloomington, Ill., as a bequest to a corporation organized and operated exclusively for religious and charitable purposes.

### FINDINGS OF FACT.

1. Bert R. McReynolds is the duly appointed, qualified, and acting executor of the last will and testament of Harden J. Brown, deceased.

2. The decedent, Harden J. Brown, died testate February 18, 1923, devising and bequeathing his residuary estate to the Bloomington Consistory, Ancient and Accepted Scottish Rite. Paragraph (6) of his will making such bequest is as follows:

All the rest and residue of said moneys in the hands of my executor and trustee, after the paying of the foregoing amounts, shall be paid by my executor and trustee to the Bloomington Consistory Ancient and Accepted Scottish Rite, Valley of Bloomington, Illinois.

The value of such residuary bequest is $85,000.

3. The Bloomington Consistory Ancient and Accepted Scottish Rite is a corporation organized under the laws of the State of Illinois and was incorporated on the 21st day of June, 1918. It is a subordinate organization of the Supreme Council Ancient and Accepted Scottish Rite, Northern Jurisdiction, organized under the laws of the Commonwealth of Massachusetts. In the articles of incorporation of the Bloomington Consistory, the object for which it was formed is stated as follows:

The object for which it is formed is social, moral, fraternal, and religious betterment of its membership.

4. The Bloomington Consistory is a secret fraternal lodge with secret ritualistic work, passwords, grips, etc. Applicants for membership are required first to attain the first three degrees of Masonry; are thoroughly investigated, and must be of high character, worthy, and well qualified. The initiation fee is $40 and the annual dues are $10. There is no distinction in law between the Masonic Order and the Consistory of the Ancient and Accepted Scottish Rite. The Bloomington Consistory was organized for the purpose of exemplifying the teachings of Freemasonry and the promulgation of religious and charitable ideas. No member of the lodge has any legal right to any of the funds or property of the organization, and it does not pay sick or death benefits to its members out of its funds or property.

5. The Bloomington Consistory owns the Temple Building at Bloomington, Ill. The Temple is used exclusively for the entertain-

ment, meetings, and ceremonies of the Scottish Rite and other affiliated Masonic bodies. It has a dining hall which seats approximately 1,000 persons. This dining hall is sometimes rented to large community gatherings upon the payment of a sum sufficient to cover the incidental expenses. The public from time to time is also permitted to witness pageants in the auditorium of the Temple.

6. The membership consists of about 4,000 persons. The money derived from initiation fees and annual dues is used for the maintenance of the Temple and the general expenses of the lodge. At times contributions are received from its members and applied to charitable purposes. In cases of some extraordinary catastrophe, such as the Japanese earthquake, contributions have been made by appropriation from the general treasury of the Consistory.

7. In the conferring of degrees, certain historical, philosophical, and religious facts and teachings are presented to the candidates by pageant and lecture and, on two days each year, religious services are held commemorating the lives of St. John the Divine and St. John the Baptist. Any member of any religious belief is admitted to membership so long as he believes in a Supreme Being. There is no discrimination against the members of any church or faith, religious toleration being one of its teachings.

### DECISION.

The determination of the Commissioner is approved.

### OPINION.

LITTLETON: The Commissioner held that the bequest was not an authorized deduction from the decedent's gross estate under the provisions of section 403 (a) (3) of the Revenue Act of 1921. The sole issue in this appeal is whether the value of the residuary estate devised and bequeathed to the Bloomington Consistory Ancient and Accepted Scottish Rite is an authorized deduction from the decedent's gross estate under this Act, which provides:

That for the purpose of the tax the value of the net estate shall be determined—
* * * by deducting from the value of the gross estate * * * all bequests, legacies, devises, * * * to or for the use of any corporation organized and operated exclusively for religious, charitable, * * * purposes * * *.

The bequest of $85,000 was made directly to the Bloomington Consistory, without specification as to the purpose for which it should be used. It therefore becomes necessary for the Board to decide whether the Bloomington Consistory Ancient and Accepted Scottish Rite is a corporation organized and operated exclusively for religious or charitable purposes. The certificate of incorporation shows that the corporation was formed for social, moral, fraternal, and religious betterment of its membership.

The executor contends that the Bloomington Consistory, which is a part of the Masonic fraternity, is an order whose aims, objects, and practices are mainly charitable and religious in character, and that whatever there may be in its aims and practices neither chari-

table nor religious is incidental merely and does not detract from its main purposes; that charity and religion are therefore so blended in the organization that it may be properly termed exclusively charitable and religious; and that the Consistory, being devoted to the promotion of these objects, is a corporation organized and operated exclusively for charitable and religious purposes within the meaning of the Revenue Act. With reference to the charity feature of the Consistory, it is contended that charity is not restricted in its meaning to alms-giving or financial relief, but includes all enterprises which produce no profit to the promoter but tend to the improvement, welfare, and happiness of mankind. It is argued in this connection that, entirely apart from any material benefactions, since the Scottish Rite bodies in their ceremonies instruct their members by precept of their duties to others in kindliness and fraternal feelings, thus encouraging those members who are depressed in spirit and stimulating them not only to renewed efforts in their own affairs but to take an interest in the welfare of others, an organization in which such principles are taught would be, for that reason, charitable, within the meaning of the statutes.

The executor contends that the Bloomington Consistory Ancient and Accepted Scottish Rite is a religious organization and bases this contention upon the fact that the Scottish Rite degrees are conferred in great solemnity; that prayers are said and the candidate is taught and required to believe in God or a Supreme Being to whom he owes reverence, loyalty, service, and honor; that he is taught that the soul is immortal and that he is accountable to the Supreme Being after death; that God is the Father and we are brethren who owe a mutual duty to each other, and that the purpose of the Order is to make men better.

Many authorities are cited by the executor which tend to support his claim that the Bloomington Consistory is a charitable and religious organization. · We have given particularly careful consideration to the authorities cited, but we are not convinced that Masonic lodges are organized and operated *exclusively* for *religious* and *charitable* purposes. Practically all of the authorities cited by the executor are cases which arose under state statutes which did not contain the words "exclusively organized and operated," others being based upon issues not involving the question of whether the Masonic Fraternity is exclusively a religious and charitable organization. We do not, therefore, deem it necessary to discuss in detail the authorities cited by the executor and the Commissioner.

We are not convinced from the evidence that Masonic lodges are organized and operated exclusively for religious and charitable purposes. While their ideals are high and they perform many charitable deeds and use Biblical precepts, characters, and scenes in their ritual, we can not conclude from this that they are exclusively religious and charitable, either under the ordinary interpretation of the term, or under the law. The controlling characteristic of a religious or charitable corporation is that its income is devoted *exclusively* and not incidentally to religious or charitable purposes.

In the case of *Trinidad, Collector*, v. *Sagrada Orden De Predicadores, etc.*, 263 U. S. 578, the court had before it for construction section II, paragraph G (a), of the Revenue Act of 1913, which con-

tained the language used in section 403 (a) (3) of the Revenue Act of 1921. In that case the court said:

Whether the contention is well taken turns primarily on the meaning of the excepting clause, before quoted from the taxing act. Two matters apparent on the face of the clause go far toward settling its meaning. First, it recognizes that a corporation may be organized and operated exclusively for religious, charitable, scientific or educational purposes, and yet have a net income. Next, it says nothing about the source of the income, but makes the destination the ultimate test of exemption.

Evidently the exemption is made in recognition of the benefit which the public derives from corporate activities of the class named, and is intended to aid them when not conducted for private gain.

It can not be said that the income of a Masonic lodge is used exclusively for religious and charitable purposes or that Congress intended to exempt from the tax gifts to a corporation which may promote religious and charitable ideas and carry on benevolent and charitable work but whose primary object is fraternal and social. The purpose of the excepting clause was to encourage gifts to organizations whose sole and exclusive object is religious, charitable, educational, scientific, etc.

In the case of the *Y. M. C. A. of Columbus, Ohio*, v. *Davis*, 264 U. S. 47, the court said:

Congress was looking at the subject from the standpoint of the testator and not from the immediate point of view of the beneficiaries. It was intending to favor gifts for altruistic objects, not by specific exemption of those gifts but by encouraging testators to make such gifts. Congress was in reality dealing with the testator before his death. It said to him "if you will make such gifts, we'll reduce your death duties and measure them not by your whole estate but by that amount, less what you give."

We can not escape the fact that Masonry is a great fraternal lodge organized and operated primarily for the benefit of its members. It has secret rituals. It is open only to those who are thoroughly investigated and passed upon, and found satisfactory to its own members. The initiation fees and other moneys are, for the most part, used exclusively in the maintenance of lodge rooms, buildings, and for the entertainment and convenience of its membership.

The question whether the Scottish Rite is exclusively religious and charitable was before the Supreme Court of the State of Nebraska in the case of *Scottish Rite Building Co.* v. *Lancaster County*, 182 N. W. 574, wherein the court said:

While it is true that the thought expressed in the word "charity" is, in the language of the poet, the philosopher, or the moralist, capable of many varieties and shades of meaning, the writer is convinced that it would be unreasonable to attribute to the framers of our Constitution any intention to give so broad a signification to the words "charitable purposes" as that contended for by the appellant. They did not, in other words, intend to include in those words the expression or inculcation of charitable sentiments, thereby giving a merely subjective meaning to the word "charitable." What they meant, common sense teaches us, was concrete, practical, objective charity, manifested in things actually done for the relief of the unfortunate and the alleviation of suffering, or in some work of practical philanthropy, as contrasted with the sentimental or ethical viewpoint. The question of fact, therefore, is whether or not the building in question was, in a practical sense, used for charitable purposes, and it can not be held to have been so used unless charity was actually dispensed there, or unless it provided necessary quarters for an organization whose prime purposes and functions were actively charitable. * * *.

As to the active charity dispensed by these bodies, we find that no fixed percentage of the revenues is set aside for charity. There is an almoner, who

is the custodian of the funds set apart for charity and attends to their distribution. Voluntary contributions are taken up at every meeting, to be used for charity. Appropriations are sometimes made by a vote of the lodge, out of its general fund, for that purpose. * * *

* * * Nevertheless, persons or institutions of wealth or means, however generous, who, even though they systematically allot a fixed part of their income to charity, are yet engrossed in pursuits and interests in which charity, while not entirely excluded, does not play a leading part, are not entitled to claim that they devote themselves chiefly to charity. Neither is a fraternal order entitled to claim exemption of its property from taxation because it encourages charity among its members and itself makes substantial donations to charity, when the evidence shows that its principal activities were not in that direction, but were, for the most part, centered in promoting the interests and in gratifying the tastes of its own membership.

In discussing the proposition that the Scottish Rite Building should be exempt from taxation because it was used exclusively for religious purposes, the court said:

The theory that these facts with regard to the Scottish Rite ritual stamp it as a religious, as distinguished from a secular, organization indicates a misconception of the tenets and policy of the order which, with respect to the so-called religious features mentioned, are shown by the record to be the same as those of Masonry generally. The evidence shows that belief in and reverence for a Supreme Being are required of each and every member; that it makes no difference whether that Supreme Being is "God" or "Allah"; that belief in Christianity is not exacted, and that people may belong who do not believe in the divinity of Christ. The fact that belief in the doctrines or Deity of no particular religion is required, of itself, refutes the theory that the Masonic ritual embodies a religion, or that its teachings are religious. Is it conceivable that the Scottish Rite bodies, or the Masonic Order generally, set themselves up as exponents of a new religion? For if they belong to none of the old established religions, and yet assume to preach or expound religion, they must be embarking upon a new theology and setting up a religion of their own.

The true interpretation of the Masonic attitude in that respect is that no religious test at all is applied as a condition of membership. The guiding thought is not religion but religious toleration. The order simply exacts of its members that they shall not be atheists and deny the existence of any God or Supreme Power. Each member is encouraged to pay due reverence to his own God, the Deity prescribed by his own religion and to obey those precepts of human conduct, which, while taught by all religions prevalent in civilized society, do not appertain to the mysteries or doctrines of any religion, as such, but are common to all. The Masonic fraternity, in other words, refrains from intruding into the field of religion and confines itself to the teachings of morality and duty to one's fellow men, which make better men and better citizens.

The distinction is clear between such ethical teachings and the doctrines of religion. One can not espouse a religion without belief and faith in its peculiar doctrines. If a Christian, for instance, one must believe in the divine mission and revelation of the Saviour, with all that is implied and included therein; if a Mohammedan, one must believe in the revelation of the doctrine of that religion through the Koran, of which Mohammed was the prophet. A fraternity, however, broad enough to take in and cover with its mantle Christian, Moslem, and Jew, without requiring either to renounce his religion, is not a religious organization, although its members may join in prayer, which in the case of each, is a petition addressed to his own Deity. Neither can belief in the immortality of the soul be denominated religious, in the sense that it is typical of any religion, of any race, or of any age. It constitutes, to be sure, one of the most beautiful and consolatory features of our own religion, but it is equally to be found in almost every other. It is so universal and spontaneous that it is not so much a belief or dogma as it is an instinct of the human soul. Neither does it imply or require adherence to any system of religious worship; many pagan and infidel philosophers have asserted it. It is so generally subscribed to by everybody that it does not run counter to any one's religious belief, and, as in the case of belief in the Supreme Being, the profession of belief in the immortality of the soul does not create any religious division among the members of the Masonic order.

It can not but occur to the thoughtful mind that in putting forward the resemblance of its ceremonies to the observances of religious worship, and in claiming the right to exemption for its property from taxation upon that ground, counsel have assumed a position which, when carried to its final analysis, would, if sustained, go farther than the order itself has clearly contemplated, and would lead to results alike harmful and impracticable. For the Scottish Rite bodies to be pronounced by law, or court decision, religious organizations would mean that their meetings must be construed to be the equivalent of divine worship, and their officiating officers to be clergymen or ministers—of what gospel, it is impossible to say. Owing to the perfect liberty of conscience which people of every religious faith enjoy under our institutions, it has become a marked characteristic of religious worship in this country that it should be held in public and with open doors. It would be an anomaly, to say the least, if it should become the practice to give religious sanction to the meetings of secret societies and to rites and services carried on in the guise of religious worship to which the public would be denied admittance.

The fact that they display in their ceremonies a becoming reverence for the Deity and strive to inculcate the principles of morality does not change the essentially temporal or secular character of the Scottish Rite bodies, or clothe them with the spiritual or sacred attributes of a religious or ecclesiastical institution, any more than the custom of family prayers, or of religious or moral instruction in the home, would have that result. *St. Louis Lodge, B. P. O. E.* v. *Koeln*, 262 Mo. 444, 171 S. W. 329, L. R. A. 1915C, 778, Ann. Cas. 1916E, 949. The evidence will not bear out the assumption that the ceremonies in question are religious rites or services.

The reasoning of the court in the foregoing case is in every respect, in our opinion, applicable to the case under consideration. .

The Board is of the opinion that the Bloomington Consistory Ancient and Accepted Scottish Rite is not a corporation organized and operated exclusively for religious or charitable purposes within the meaning of section 403 (a) (3) of the Revenue Act of 1921.