T.C. Memo. 2000-91


UNITED STATES TAX COURT


ESTATE OF LLOYD P. CAVETT, DECEASED, LLOYD PETERSON
AND KYLE C. BROOKS, CO-EXECUTORS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 21702-96, 21735-96.          Filed March 15, 2000.


     R determined deficiencies in both estate and gift
taxes. Ps claim overpayments of estate tax.  We must
determine whether (1) Ps are estopped from denying that
certain inter vivos payments to decedent's longtime
companion were gifts, (2) assuming there is no
estoppel, the payments were gifts or payments for
services, (3) a bequest to that companion is a
deductible claim against the estate, (4) only one-half
the value of decedent's residence is includable in the
gross estate, and (5) certain bequests to Masonic and
fraternal organizations are deductible for estate tax
purposes.
     1.  Held: Ps are not estopped from denying the
gift character of the inter vivos payments.
     2.  Held, further, the inter vivos payments were
gifts.
     3.  Held, further, the bequest is not a deductible
claim against the estate.

4. <u>Held</u>, <u>further</u>, all of the value of the residence is includable in the gross estate, but no portion is includable as an "adjusted taxable gift".

5. <u>Held</u>, <u>further</u>, no deduction is allowed for the bequests to the Masonic and fraternal organizations, since petitioner has failed to prove the exclusive charitable purpose of those bequests.

<u>Kyle C. Brooks</u>, <u>Mark A. Denny</u>, <u>Richard D. Lameier</u>, and <u>James H. Stethem</u>, for petitioners.

<u>John E. Budde</u> and <u>John A. Freeman</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, <u>Judge</u>:  Respondent has determined deficiencies in both Federal estate and gift tax liabilities.  Those deficiencies are a gross deficiency in estate tax of $213,845[1] and the following amounts of gift taxes:

| Taxable (Calendar) Year | Amount |
| --- | --- |
| 1964 | $298 |
| 1965 | 453 |
| 1966 | 731 |
| 1967 | 1,370 |
| 1968 | 1,484 |
| 1969 | 668 |
| 1970 | 707 |
| 1971 | 1,257 |
| 1972 | 970 |

---

[1]  Respondent's notice of deficiency provides for an additional State death tax credit "not exceeding $62,318.00" for a "Net Deficiency Determined" of $157,527.  We assume that this computation refers to the additional State death tax that would accrue if we fully sustain respondent's determination of a deficiency in estate tax liability.  Apparently, the computation presents no issue for our determination.

|      |       |
|------|-------|
| 1973 | 1,143 |
| 1975 | 726   |
| 1976 | 59    |

Petitioners have made two claims for refund of estate taxes in the amounts of $212,438.06 and $80,984.70 (the first and second claim for refund, respectively). Certain adjustments relating to the estate tax deficiency have been settled and are no longer of concern to us.

An issue common to these consolidated cases is whether certain payments by Lloyd Cavett (decedent) to Rose Bell (Bell) were gifts. In connection with that issue, we must determine whether petitioners are collaterally estopped from denying that those payments were gifts. Additionally, we must determine whether: (1) Certain bequests to Bell constitute deductible claims against the estate (the first claim for refund), (2) petitioners are entitled to reduce the value of decedent's residence included in the gross estate by 50 percent as a result of respondent's inclusion of 50 percent of that residence as an adjustable taxable gift (the second claim for refund), and (3) petitioners are entitled to a $22,000 deduction for donations to various Masonic and fraternal organizations.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect, with respect to the estate tax, at the time of decedent's death or, with respect to the gift taxes, for the taxable year during which the particular gifts

were made. All Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some facts have been stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference.

Introduction

At the time the petitions herein were filed, petitioners Lloyd Peterson and Kyle C. Brooks both resided in Hamilton County, Ohio. Decedent died testate on October 27, 1992.

Decedent's Wills

Between January 17, 1951, and June 4, 1991, decedent executed six wills and six codicils. By his will dated June 15, 1981 (the 1981 will), decedent bequeathed the residue of his estate in trust for the support and care of his invalid adult daughter. With respect to the funds to be placed in trust, the 1981 will provided: "Out of the net income, also, a compensation shall be paid to Rose A. Bell, for such care, attention and services as she may be able to render to my said daughter". The 1981 will also contained a devise and specific bequests to Bell, including decedent's residence (with the provision that decedent's daughter be allowed to live there until an alternative residence was made available to her), his personal property, $100,000, and three grave sites. By the 1981 will, decedent also

made bequests of $10,000 to each of Bell's children and $2,000 to her grandson. The 1981 will contained an "in terrorem" clause, providing that, if any beneficiary should contest the will, he or she should receive nothing. In a codicil to the 1981 will, executed on December 10, 1982, decedent, among other things, made an additional bequest to Bell of another $100,000.

Decedent's final will is dated June 29, 1990. It, together with a trust agreement and codicil (together, the will), disposed of decedent's property. Petitioner Kyle C. Brooks, an attorney, assisted decedent with estate planning and drafted the will.

Bell is a principal beneficiary under the will. Pursuant to the will, she received the following property, valued as shown:

| | |
|---|---|
| Partial interest in a residence located at 325 Wyoming Ave. | [1]$400,000 |
| Cash | 350,000 |
| Rookwood Collectibles | 14,134 |
| Cemetery Plots | 3,750 |
| Automobile | 13,000 |
| Personal Items | 34,476 |
| Total | 815,360 |

[1] Value of the entire residence.

Pursuant to the will, various Masonic and fraternal organizations received bequests totaling $22,000, as follow:

| | |
|---|---|
| Cincinnati Lodge of Elks #5 | $1,000 |
| Cincinnati Court, Royal Order of Jesters | 1,000 |
| Wyoming Masonic Lodge F&AM #186 | 10,000 |
| Wyoming Chapter #146 Royal Arch Masons | 1,000 |
| Cincinnati Royal & Select Masters #1 | 1,000 |
| Cincinnati Commandery #3 Knights Templars | 1,000 |
| Ancient Accepted Scottish Rite | 1,000 |
| Syrian Temple AAONMS | 1,000 |
| Cincinnati Chapter Triangle Fraternity | 5,000 |
| Total | 22,000 |

The will places no limitations or restrictions on how those organizations may use such bequests.

Agreement To Make Will

On August 19, 1982, decedent and Bell executed a document entitled "Agreement to Make Will".  In pertinent part, that document provides:

> WHEREAS, Cavett has been a widower for twenty years and is presently eighty years of age, and
>
> WHEREAS, Cavett has a daughter now fifty-two years of age who has been incapacitated from an accident since age nine and,
>
> WHEREAS, Bell has for many years on a twenty-four hour basis, staying overnight, cared for said daughter, Cavett and Cavett's home, supervising the cleaning thereof and done the cleaning and washing in the maid's absence:
>
> NOW THEREFORE, in consideration of Bell's past services and the covenants and agreements herein contained, it is agreed by and between the parties hereto as follows:
>
> 1.  Bell agrees to continue her services in the care of Cavett, Cavett's daughter and Cavett's home as in the past so long as she is physically able to do so.
>
> 2.  Cavett agrees that his last Will and Testament at his death will contain provisions leaving to Bell no less than he has devised and bequeathed to her in his present Will, executed on June 15, 1981, a copy of which is attached hereto and made a part hereof provided, however, Cavett shall have the right to sell his residence known as 325 Wyoming Avenue, Cincinnati, Ohio 45215, and if he does so, agrees to and shall bequeath to Bell an amount equal to the net proceeds of sale, in addition to the other bequests contained in said Will executed on June 15, 1981.

3.  This agreement shall be binding on the heirs, legal representatives and assigns of both parties hereto.

4.  This agreement may not be altered, changed or modified except in writing, signed by both parties hereto.

5.  This agreement constitutes the entire agreement and understanding of the parties.  There are no representations or warranties other than those expressly herein set forth.

The Relationship

Decedent and Bell met in 1947.  At that time, they were each married to other persons.  They developed a close, personal relationship.

In 1957, Bell and her husband were divorced, following a dispute concerning Bell's relationship with decedent.

Decedent's wife (Mrs. Cavett) died in 1963.  Decedent and Mrs. Cavett had one child, who was disabled and resided with decedent until her death in 1987.

Following Mrs. Cavett's death, decedent involved Bell fully in both his personal and social life.  For example, (1) decedent and Bell resided together, (2) they traveled together as husband and wife, (3) they used endearments, such as "sweetheart" and "honey" when referring to each other, (4) Bell had unrestricted access to decedent's wealth, (5) decedent and Bell had joint bank accounts, (6) decedent gave Bell gifts including cash, real and personal property, jewelry and vacations, (7) decedent transferred his residence into joint ownership with rights of

survivorship to Bell and himself, and (8) decedent asked Bell to serve on a committee that was created to make decisions about his medical care in the event that he was unable to do so.

Bell and decedent had a loving relationship. They never married. Decedent also established a close relationship with Bell's family. In the will, decedent left cash bequests to several members of Bell's family.

## The Ledgers

Decedent was a meticulous record keeper who maintained handwritten journals of his personal expenditures (the ledgers). In the ledgers, decedent recorded the checks he wrote, showing the payee and classifying the payment by purpose (e.g., "Cash" and "Travel exp."). One classification is variously labeled "Rose Exp.", "RAB Exp." or something similar, and refers to payments to or with respect to Bell (the Bell payments). When decedent became too old to maintain the ledgers personally, Bell's daughter-in-law, Carol Bell, maintained them at decedent's direction. Bell never made any entries in the ledgers.

## The Bell Payments

The Bell payments commenced in 1986 or earlier and continued until the time of decedent's death. The Bell payments were made from a checking account of decedent's (the checking account). Bell enjoyed a power of attorney to write checks on the checking account. During the last 2 years of decedent's life, Bell wrote

many checks on the checking account payable to herself.  Bell used part of those payments to purchase items for decedent's home.

## The Lawsuit

Following decedent's death, petitioners brought suit in the Court of Common Pleas, Hamilton County, Ohio (the State court), alleging that Bell had committed acts of theft, fraud, and breach of fiduciary duty against decedent.  Among the averments supporting those allegations, petitioners averred that, from July 1990 through October 1992, Bell wrongfully withdrew approximately $59,080 from the checking account.  Bell prevailed in the State court; with respect to petitioners' allegation that she violated a fiduciary duty to decedent by withdrawing money from the checking account, the State court found that she had not and further found:  "[Bell] has proved by evidence of a clear and convincing nature that the checks in question were, in fact, gifts by * * * [decedent] to and for the benefit of * * * [Bell]."  The Court of Appeals for the First Appellate District of Ohio, Hamilton County, Ohio, affirmed the decision of the State court.  The decision of the State court is now final.

## Tax Returns

Petitioners timely made an estate tax return on Form 706, U.S. Estate (and Generation-Skipping Transfer) Tax Return.

Petitioners claimed no deduction on account of any claim against the estate by Bell.

During the years at issue, decedent filed only one gift tax return. That return was filed in 1975, and reports a gift of real property to Bell.

Respondent's Adjustments on Account of Taxable Gifts

Respondent examined the ledgers and determined the Bell payments for each year. Respondent then subtracted certain unspecified amounts from each year's total Bell payments. The resulting differences are the amounts determined by respondent as gifts to Bell for each year. The Bell payments treated by respondent as gifts are as follows:

| Year | Amount |
| --- | --- |
| 1964 | $6,610 |
| 1965 | 8,093 |
| 1966 | 9,959 |
| 1967 | 13,499 |
| 1968 | 12,190 |
| 1969 | 6,790 |
| 1970 | 6,769 |
| 1971 | 9,449 |
| 1972 | 7,610 |
| 1973 | 8,443 |
| 1975 | 21,812 |
| 1976 | 3,283 |
| 1978 | 3,436 |
| 1979 | 4,273 |
| 1981 | 5,430 |
| 1985 | 82,849 |
| 1987 | 57,789 |
| 1988 | 27,879 |
| 1990 | 32,379 |
| 1991 | 18,119 |

Claims For Refund of Estate Taxes

Petitioners made the first claim for refund on June 25, 1996. The basis for the claim is that $797,475.50 originally reported as a bequest to Bell is properly to be reclassified as a debt of the estate under a contract to make a will. Petitioners claim a reduction in estate tax from $212,438.06 to zero.

Petitioners made the second claim for refund on July 22, 1996. The basis for that claim is that (1) on account of a prior gift, only one half of the value of decedent's residence is properly includable in his gross estate ($200,000 rather than $400,000), and (2) the estate incurred additional administrative expenses of $138,327.86.[2] Petitioners claim a reduction in estate tax of $80,984.70.

## OPINION

### I. Introduction

During his life, Lloyd Cavett (decedent) made certain payments to Rose Bell (Bell and the Bell payments). We must decide whether the portion of the Bell payments determined by respondent to be gifts (the Bell gifts) were gifts, as claimed by respondent, or (in part) payments for services, as claimed by petitioners. We must also decide (1) whether certain bequests to

---

[2] On brief, petitioners state their intention to abandon the claim with respect to the additional administrative expenses. Therefore, we resolve it against petitioners and will not address it further.

Bell constitute deductible claims against the estate on account of an agreement to make a will, (2) the value of an interest in a certain residence included in the gross estate, and (3) the deductibility of certain charitable bequests. Before proceeding to those issues, we must address respondent's claim that petitioners are collaterally estopped from denying that the Bell payments are gifts.

Petitioners bear the burden of proof. See Rule 142(a).

II. Collateral Estoppel

Following decedent's death, petitioners brought suit in State court, in Ohio, against Bell, alleging that Bell had committed acts of theft, fraud, and breach of fiduciary duty against decedent. Among other things, petitioners averred that from July 1990 through October 1992, Bell wrongfully withdrew approximately $59,080 from a checking account owned by decedent. Bell prevailed in that suit. The State court found that she had not violated a fiduciary duty to decedent with respect to withdrawing money from his checking account. The State court further found that the checks in question were gifts from decedent to Bell. On the basis of those findings, respondent argues that petitioners are collaterally estopped from claiming that checks totaling $59,080 paid to Bell from decedent's checking account during 1990, 1991, and 1992 are other than gifts.

Recently, we summarized our position with respect to collateral estoppel as follows:

> The doctrine of issue preclusion, or collateral estoppel, provides that, once an issue of fact or law is "actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." Montana v. United States, 440 U.S. 147, 153 (1979) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979)). Issue preclusion is a judicially created equitable doctrine whose purposes are to protect parties from unnecessary and redundant litigation, to conserve judicial resources, and to foster certainty in and reliance on judicial action. See, e.g., id. at 153-154; United States v. ITT Rayonier, Inc., 627 F.2d 996, 1000 (9th Cir. 1980). This Court in Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), affd. 904 F.2d 525 (9th Cir. 1990), set forth the following five conditions that must be satisfied prior to application of issue preclusion in the context of a factual dispute (the Peck requirements):
>
> (1) The issue in the second suit must be identical in all respects with the one decided in the first suit.
>
> (2) There must be a final judgment rendered by a court of competent jurisdiction.
>
> (3) Collateral estoppel may be invoked against parties and their privies to the prior judgment.
>
> (4) The parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision.
>
> (5) The controlling facts and applicable legal rules must remain unchanged from those in the prior litigation. [Citations omitted.]
>
> See also Clark v. Bear Stearns & Co., 966 F.2d 1318, 1320 (9th Cir. 1992)(highlighting conditions (1) and (4) above).

Monahan v. Commissioner, 109 T.C. 235, 240 (1997).

Petitioners' claim is that the Bell payments were for services. The issue in the State court was whether Bell had committed acts of theft, fraud, and breach of fiduciary duty against decedent. The State court found that she had not and, although the State court found that the payments there in question were gifts, the State court did not have before it the question of whether the payments were gifts or, alternatively, for services. It was not "essential" for the State court to find that the payments there in question were gifts for it to find that Bell had neither stolen anything from decedent nor breached a fiduciary duty. Because the issue in this case was not actually litigated in the State court, collateral estoppel is inapplicable, and petitioners are not estopped from denying that the Bell payments were gifts.

III. The Bell Gifts

A. Introduction

Decedent kept handwritten journals showing his personal expenditures (the ledgers). The ledgers show the Bell payments, and, from the Bell payments, respondent calculated the Bell gifts. Petitioners concede that some of the Bell gifts are, indeed, gifts (i.e., those specifically annotated as birthday gifts, Valentine's Day gifts, or gifts for other special occasions). Petitioners maintain that the remainder of the Bell gifts (the contested Bell gifts) are not gifts but reimbursements

for amounts paid by Bell for the Cavett family or compensation for companionship or other specific services.

The parties agree that the test of whether a transfer constitutes a gift is whether the transfer proceeds from a "detached and disinterested generosity * * * out of affection, respect, admiration, charity or like impulses". Commissioner v. Duberstein, 363 U.S. 278, 285 (1960). Petitioners do not challenge the contested Bell gifts on a payment-by-payment basis but direct our attention to three documents written by or prepared for decedent, which, petitioners argue, establish that the contested Bell gifts did not flow from a detached and disinterested generosity (i.e., are not gifts). Those documents are: (1) An agreement to make a will executed by Bell and decedent (the Agreement), which, petitioners argue, establishes the employment relationship between Bell and decedent, (2) decedent's 1981 will (the 1981 will), which provides that Bell shall be compensated for caring for decedent's invalid adult daughter, and (3) annotations in the ledgers, which, only in some cases, specify that the transfer was a gift. Petitioners acknowledge that there existed a "close and affectionate relationship" between Bell and decedent. Petitioners argue: "However, the relationship between the decedent and Bell was more complicated and included an employment relationship between these two individuals."

We will analyze the three documents relied upon by petitioners. First, however, we wish to state our view of the relationship between Bell and decedent: Bell and decedent met in 1947 and developed a close, personal relationship. Following the death of decedent's wife in 1963, they resided together in decedent's house. They had a loving relationship, traveled together as husband and wife, and, together, cared for decedent's invalid daughter. Bell supervised decedent's household. Decedent entrusted Bell with access to his wealth and gave her power to make decisions with respect to his medical care. During the years here in question, their relationship resembled that of a successful marriage and not an employment relationship.

B. <u>The Agreement</u>

We have set forth the pertinent provisions of the Agreement in our findings. Although the Agreement describes both past and future services and, thus, is consistent with an employment relationship, we believe that the Agreement signifies decedent's desire to protect Bell from a will contest following decedent's death. Petitioner Kyle C. Brooks and other witnesses testified that decedent was concerned that a will contest would follow his death. Decedent told Betty C. Bryan, one of the witnesses to the Agreement, that he wished to be sure that Bell was taken care of. Moreover, the past and future services referred to in the Agreement are consistent with the loving, marriagelike

relationship that existed between Bell and decedent.  We believe that Bell's willingness to perform those services proceeded from love and affection and not from any expectation of profit.  We likewise believe that decedent understood that those services were performed out of feelings of love and affection, and not in expectation of any profit.  If the services to decedent sprang from love and affection, the services themselves are tantamount to an expression of love and affection, which cannot be reduced to money or money's worth.  See sec. 25.2512-8, Gift Tax Regs. By the Agreement, decedent agrees to leave Bell no less than what he left to her in his 1981 will.  By the 1981 will, decedent devised Bell his house and bequeathed to her his personal property, $100,000, and three grave sites.  Other than decedent's daughter, Bell is by far the most favored beneficiary under the 1981 will.  By a codicil executed in December 1982, decedent increased the cash bequest to Bell by $100,000.  By the 1981 will, decedent also left substantial sums not only to Bell's children but also to her grandchild.  We cannot reconcile the generosity of those provisions with an employment relationship. See, e.g., Reynolds v. Commissioner, T.C. Memo. 1999-62.

C.  The 1981 Will

Petitioners argue that the 1981 will shows that Bell was an employee of decedent.  By the 1981 will, decedent provided for the care of his invalid adult daughter.  He also provided that "a

compensation shall be paid to * * * [Bell], for such care, attention and services as she shall be able to render to my said daughter" (the compensation provision). Decedent's daughter predeceased him, so the compensation provision in question never came into effect. We attach very little weight to the compensation provision. Decedent's daughter was not Bell's daughter. Bell may very well have felt affection for her. Nevertheless, Bell was not a wealthy woman. Decedent was wealthy, and his providing for compensation to be paid to Bell to encourage her to look after his daughter is natural. It tells us very little about decedent's view of his relationship with Bell so long as he lived.

D. The Ledgers

Apparently, the ledgers record all of the Bell payments. Several of the Bell payment entries are annotated "Sal". Petitioners contend that the term "Sal" is an abbreviation for the word "salary". Petitioners argue that the monthly pattern of these transfers and the identification of some of the transfers as "Sal" shows that the checks were payment for services.

While petitioners may have exposed an ambiguity in some of the Bell payments, no dispositive evidence was presented that proves the checks were not gifts. We have found that Bell and decedent had a close, personal, and loving relationship, resembling a marriage. We are unpersuaded by any of the

annotations in the ledgers that decedent paid Bell for any services that were not freely and voluntarily given, out of love and affection, and received in the same spirit. This issue in this case resembles a similar issue in Pascarelli v. Commissioner, 55 T.C. 1082 (1971). In Pascarelli, the taxpayer and a Mr. DeAngelis lived much like decedent and Bell, and we had to determine whether certain payments by Mr. DeAngelis to the taxpayer were gifts or compensation for services rendered. We concluded: "These circumstances led us to find that the petitioner did not perform services for Mr. DeAngelis for the purpose of obtaining compensation, but rather with the same spirit of cooperation that would motivate a wife to strive to help her husband advance in his business." Id. at 1091. We found that payments in question were gifts from Mr. DeAngelis to the taxpayer because they "proceeded from disinterested and detached generosity * * * motivated by sentiments of affection, respect, and admiration". Id. at 1091. The same is true here.

E. Conclusion

Petitioners have failed to convince us that the contested Bell gifts were anything other than gifts. Petitioners have failed to prove that there was any commercial aspect to decedent's relationship with Bell. To the contrary, we believe that their relationship was one of love and affection, each giving freely and voluntarily to the other without any

- 20 -

expectation of gain or profit. There was no employment relationship.

IV. First Claim for Refund

Petitioners claim an overpayment of estate tax in the amount of $212,438.06 on account of their failure to deduct $797,475.50 as a claim against the estate. That amount (the inheritance) represents the value of substantially all of the assets received by Bell pursuant to decedent's last will and the accompanying trust agreement (together, the will). Petitioners argue that the inheritance was paid pursuant to decedent's obligation to provide for Bell in his will, which obligation was established by the Agreement.

Section 2053(a) provides that the value of the taxable estate shall be determined by deducting from the value of the gross estate certain items, including claims against the estate. See sec. 2053(a)(3). In pertinent part, section 2053(c)(1)(A) provides: "The deduction allowed by this section in the case of claims against the estate, unpaid mortgages, or any indebtedness shall, when founded on a promise or agreement, be limited to the extent that they were contracted bona fide and for an adequate and full consideration in money or money's worth".

We first note that the Agreement is not mentioned in the will, and petitioners have failed to show that Bell has made any claim against the estate. Petitioner Kyle C. Brooks is

decedent's attorney who assisted him in estate planning and drafted the will. He testified that decedent did not mention the Agreement to him, and he found the Agreement in decedent's safe deposit box after his death, among many old wills and other papers. Bell received more under the will than she would have under the 1981 will. Petitioners have failed to convince us that decedent did not provide for Bell in his last will independent of any obligation that he might have had under the Agreement. In short, petitioners have failed to prove that the Agreement motivated decedent to provide for Bell in the will. We do not attempt to read decedent's mind. Cf. Mahoney v. United States, 831 F.2d 641. 647 (6th Cir. 1987) (counseling against such practices in applying the estate tax). Given decedent's demonstrated affection for Bell, we hold only that petitioners have failed to provide a compensatory motive.

Furthermore, petitioners have failed to prove that any obligation imposed on decedent by the Agreement was for an adequate and full consideration in money or money's worth, which is required to support a deduction under section 2053(a)(3) and (c)(1)(A). The recited consideration includes past services, without any indication that decedent owed Bell anything with respect to those services. The future services called for from Bell are her care of decedent and decedent's daughter and decedent's home "as long as she is physically able to do so."

Petitioners have failed to place a value on that obligation. Indeed, given the circumstances of this case, we have found that those services cannot be reduced to money or money's worth. See supra sec. III.B.

Petitioners' alleged claim against the estate being founded upon an agreement, and petitioners having failed to prove an adequate and full consideration, petitioners are not entitled to any deduction under section 2503(a)(3). The claim of an overpayment in estate tax resulting from the first claim for refund is denied.

V. The Second Claim For Refund

Petitioners claim an overpayment of estate tax on account of including in the gross estate 100 percent of the value of decedent's residence, 325 Wyoming Ave, Cincinnati, Ohio (the residence). Decedent resided in the residence at the time of his death. The parties have stipulated that, on or about September 6, 1985, decedent transferred the residence to himself and Bell "for their joint lives, remainder to the survivor of them" (the transfer). In pertinent part, section 2040 provides: "The value of the gross estate shall include the value of all property to the extent of the interest therein held as joint tenants with right of survivorship by the decedent and any other person". Respondent, therefore, was correct in including the value of the residence in the gross estate. Petitioners do not

dispute that the value of the residence for estate tax purposes was $400,000.

In determining the estate tax deficiency, respondent took account of the transfer in determining adjusted taxable gifts for purposes of determining the tentative tax computed pursuant to section 2001(b)(1).[3] Respondent determined that the residence was worth $150,000 at the time of the transfer and determined a gift of $75,000, equal to one-half the value of the residence. Respondent now believes that the gift computation is erroneous. Respondent further believes that the residence should not be

---

[3] Sec. 2001(b) provides:

Computation of Tax.--The tax imposed by this section shall be the amount equal to the excess (if any) of--

(1) a tentative tax computed under subsection (c) on the sum of--

(A) the amount of the taxable estate, and

(B) the amount of the adjusted taxable gifts, over

(2) the aggregate amount of tax which would have been payable under chapter 12 with respect to gifts made by the decedent after December 31, 1976, if the provisions of subsection (c) (as in effect at the decedent's death) had been applicable at the time of such gifts.

For purposes of paragraph (1)(B), the term "adjusted taxable gifts" means the total amount of the taxable gifts (within the meaning of section 2503) made by the decedent after December 31, 1976, other than gifts which are includible in the gross estate of the decedent.

included in adjusted taxable gifts for purposes of section 2001(b)(1)(B) on account of the language in section 2001(b) excluding from "adjusted taxable gifts" gifts includable in the gross estate. Petitioners have not objected to that adjustment, and we accept it as a partial concession of petitioners' second claim for refund.

VI. <u>Deduction for Charitable Donations</u>

Decedent bequeathed $22,000 to various Masonic and fraternal organizations (the $22,000 bequest). On account of the $22,000 bequest, petitioners deducted that amount from the gross estate in determining the value of the taxable estate (the claimed charitable deduction). Respondent denied the claimed charitable deduction on the following basis: "because the [bequests] do not limit the organizations' usage to [exclusively] religious, scientific, charitable, educational, or literary purposes."

Petitioners assign error to respondent's denial of the claimed charitable deduction and, in support of that assignment, state the following:

> The specific bequests to Fraternal and Masonic organizations for $22,000 are deductible by the Estate as charitable deductions because Mr. Cavett bequeathed the funds to these organizations with the full knowledge that the organizations were to use the funds for charitable, religious, scientific, literary or educational purposes as had been their policy with past donations and bequests received. This fact is evidenced by letters of intent received from each of the organizations attesting to their plans for the use of such funds.

Section 2055 allows a deduction in computing the taxable estate for certain transfers for charitable or similar purposes. In pertinent part, section 2055(a)(3) allows a deduction for bequests to:

> a fraternal society, order, or association operating
> under the lodge system, but only if such contributions
> or gifts are to be used * * * exclusively for
> religious, charitable, scientific, literary, or
> educational purposes, or for the prevention of cruelty
> to children or animals [hereafter, without distinction,
> charitable purposes] * * *

On brief, petitioners argue: "Since there is no evidence in the record that these organizations did not use the bequests for the purposes set forth in the statute the Respondent's denial of the charitable deduction taken by the Estate on the federal estate tax return is without foundation."

Clearly petitioners recognized their obligation to prove the exclusive charitable purposes for which the $22,000 bequests were to be used. Petitioners failed to introduce any letter of intent or other evidence on point and, thus, have failed to carry their burden. Cf. First Natl. Bank of Omaha v. United States, 681 F.2d 534, 541-542 (8th Cir. 1982) (Masonic organization cannot be said to be operated exclusively for charitable purposes); First Natl. Bank in Dallas v. Commissioner, 45 F.2d 509 (5th Cir. 1930) (unrestricted bequests to Masonic organizations not organized exclusively for charitable purposes did not qualify for charitable deduction); McReynolds v. Commissioner, 1 B.T.A. 815

(1925) (similar).  Respondent's determination of a deficiency in estate tax on account of denying the claimed charitable deduction is sustained.

<u>Decisions will be entered</u>

<u>under Rule 155</u>.